WARREN TOOL COMPANY *v.* STEPHENSON.

1. EQUITY—EQUITABLE LIEN—PROPERTY.
   An equitable lien arises without the necessity of words of conveyance from an agreement that both identifies property and evidences an intention that the property serve as security for an obligation.

2. SAME—EQUITABLE LIEN—EXISTENCE OF PROPERTY.
   Establishment of an equitable lien on property is not prevented by nonexistence of the property described at the time of the agreement.

3. TRUSTS—AGREEMENT TO CONVEY A SPECIFIC THING.
   A contract to convey a specific object even before it is acquired will make the contractor a trustee as soon as he gets title to the thing.

4. EQUITY—DISTINCTION BETWEEN LIEN AND ASSIGNMENT.
   An equitable lien may be distinguished from an equitable assignment in that the lien is a *charge upon* the property while an assignment is an *interest in* the property.

5. SAME—EQUITABLE ASSIGNMENT—EQUITABLE LIEN—LANGUAGE.
   · Language that fails as an equitable assignment does not preclude the existence of an equitable lien.

REFERENCES FOR POINTS IN HEADNOTES

[1, 9] 33 Am Jur, Liens § 18.
[2, 5, 6, 8] 33 Am Jur, Liens §§ 19, 20.
[3] 54 Am Jur, Trusts § 218 *et seq.*
[4] 33 Am Jur, Liens § 3; 6 Am Jur, Assignments § 1.
[7] 27 Am Jur 2d, Equity § 126.
[10, 11] 27 Am Jur 2d, Equity §§ 86, 87.
[12] 18 Am Jur 2d, Conversion § 18.
[13] 18 Am Jur 2d, Conversion §§ 3, 4.
[14, 15] 19 Am Jur 2d, Corporations § 1382 *et seq.*
[16] 15 Am Jur 2d, Commercial Code §§ 49, 50.

6. SAME—LIENS—INTENT.

> Final intent of the parties, as shown by all the relevant evidence, rather than the particular form or nature of an agreement governs the presence or absence of an equitable lien.

7. SAME—MAXIMS.

> Equity will regard that as done which ought to be done for the purposes of effecting justice.

8. SAME—EQUITABLE LIEN—TIME OF ATTACHMENT.

> An equitable lien on property not currently in existence attaches not later than when the property comes into existence or comes under the control of the promisor who has charged it with the obligation in question; and the promisor takes this property subject to the obligation.

9. SAME—LIENS—RELIANCE ON PARTICULAR FUND.

> Reliance by the creditor on a particular fund rather than on the personal responsibility of the debtor is strong evidence of the existence of an equitable lien.

10. SAME—LEGAL REMEDY—MORE COMPLETE REMEDY.

> Existence of a legal remedy does not prevent equity from decreeing a more complete remedy.

11. SAME—MORE COMPLETE REMEDY—JURISDICTION.

> The existence of a more complete remedy in equity constitutes a sufficient ground for exercising jurisdiction in equity.

12. BILLS AND NOTES—CONVERSION.

> A negotiable instrument may be the subject of an action for conversion, but only where there is a duty to pay the plaintiff the specific money collected.

13. TORTS—CONVERSION—INTENT.

> Conversion is generally an intentional tort.

14. CORPORATIONS—PRINCIPAL AND AGENT—OFFICERS—LIABILITY FOR TORT.

> Agents and officers of a corporation are liable for torts which they commit personally, even though in doing so they are acting for the corporation and even though the corporation is also liable for the tort.

15. SAME—OFFICERS—CONVERSION—LIABILITY FOR TORT—BENEFIT.

> Corporate officers are not excused from personal liability for the conversion of property simply because the corporation benefits from the wrong and the corporate officers realize no personal profit from their act of conversion.

16. EQUITY—EQUITABLE LIEN—UNIFORM COMMERCIAL CODE.

Article 9 of the uniform commercial code is designed principally to achieve clearer perfection and to determine competing priorities of security devices daily employed in commerce and does not do away with the equitable lien in the unusual transaction for which it is the appropriate remedy (MCLA §§ 440-.9105, 440.9203).

Appeal from Wayne; Brennan (Thomas E.), J. Submitted Division 1 February 9, 1967, at Detroit. (Docket No. 1,359.)  Decided April 26, 1968.

Complaint by Warren Tool Company, a partnership, and Michigan Machine & Broach Co., a Michigan corporation, against Jack O. Stephenson and John N. Hillis for improper diversion of certain funds. Judgment for defendant. Plaintiffs appeal. Reversed and remanded for new trial.

*Piggins, Balmer, Grigsby, Skillman & Erickson,* for plaintiffs.

*August, Frimet, & Goren,* for defendant Stephenson.

*Miles Hurwitz,* for defendant Hillis.

LEVIN, P. J.  Plaintiffs seek to hold defendants, Jack O. Stephenson and John N. Hillis, former president and general manager, respectively, of the now defunct Stephenson Industries, Inc., personally liable for the diversion of certain funds which Stephenson Industries agreed to use to pay for work performed by plaintiffs.

The facts are virtually undisputed, possibly because the trial terminated in a judgment in favor of the defendants before they had an opportunity to offer their evidence. The essential facts upon which

plaintiffs rely were, however, conceded by Jack
Stephenson when he was called by the plaintiffs for
cross-examination under the statute.[1]   We state the
facts as they appear on the record, but do not intend
thereby to find the facts or to preclude the trial
judge from making his own findings on the record
as it may be supplemented at the new trial herein
ordered.

Stephenson Industries accepted plaintiffs' bid to
provide tooling required by Stephenson Industries
to perform a contract with a company called High-
way Products, Inc.   However, plaintiffs were unwill-
ing to proceed with the order on the credit of Ste-
phenson Industries and demanded further assur-
ance of payment.   Stephenson Industries rejected
a suggestion that it assign the Highway Products
account, with notification to Highway, fearing that
to do so would jeopardize its position with Highway.

Stephenson Industries suggested an alternative
security arrangement involving the Second National
Bank of Bucyrus, Ohio, the terms of which appear
in a letter dated November 5, 1962, from Hillis for
Stephenson Industries to the bank.   The letter re-
ferred to Highway's order No 19064 directed to
Stephenson Industries, which order was supposed
to cover the necessary tooling in the amount of
$16,820, and stated that such tooling had been or-
dered from the plaintiffs and Riverside Forge &
Manufacturing Company, and that the amounts to
be paid for that tooling were $13,785.85 to the plain-
tiffs and $4,840 to Riverside.   The letter continued:

"This will leave a deficit of $1,805.85 which will
be paid from the proceeds of Order No 19129 in the
amount of $199,994.   Copies of both orders from
Highway Products, Inc., are attached.

---

[1] CLS 1961, § 600.2161 (Stat Ann 1962 Rev § 27A.2161).

"To insure prompt payment of these suppliers, we are requesting that upon presentation for deposit of Highway Products, Inc., checks in payment of the above purchase orders, you agree upon collection of such funds to pay these suppliers their proportionate share based on invoices received and accepted by us. This may be accomplished either by bank draft or our certified checks."

Copies of this letter were sent to plaintiffs and Riverside.

On November 7, 1962, Stephenson Industries, through Hillis, wrote Warren Tool:

"Enclosed, herewith, is copy of our request to The Second National Bank of Bucyrus, Ohio, asking them to disburse our receipts from Highway Products, Inc., on their purchase orders 19064 and 19129 in favor of your company. Please send a copy of your invoices directly to The Second National Bank to the attention of George Stolz, President, as well as duplicate copies to our company to the attention of Linda Grove.

"The executed letter from this company to The Second National Bank should be self-explanatory, however, if there are any questions, I will be glad to help."

Plaintiffs thereafter began work on the Stephenson Industries' order; final shipments were completed in February, 1963, and plaintiffs, in accord with the agreement, sent copies of each invoice to the bank as well as to Stephenson Industries. On December 4, 1962, the bank acknowledged to Warren Tool receipt of some of the invoices and stated that, "When the funds are received from Stephenson Industries payment will be made to you in accordance with our agreement."

In February, 1963, Highway issued a check for $16,820 to Stephenson Industries in payment of in-

voices in that amount under order No 19064, the first order identified in the letter to the bank.

The check from Highway remained in Stephenson Industries' office 2 or 3 days. Deposit of the check with the Bucyrus bank, as contemplated by the agreement between the plaintiffs and Stephenson Industries, was never made. At the trial there was testimony concerning conversations with Hillis, in which Hillis is alleged to have said he wanted to deposit the check in the bank in the usual course, and as contemplated by the above letters, but that Jack Stephenson did not wish to do so. Hillis did not testify. Jack Stephenson testified that the decision not to deposit the Highway check in the bank was a joint one reached by both Hillis and himself.

Jack Stephenson, after the 2 or 3 days' delay, took the Highway check to the drawee bank and had it certified. He took the certified check to still another bank and exchanged it for cashier's checks, eight in the amount of $2,000 each and one for $820. Payee of six checks, totaling $12,000, was E. W. Roberts, Jack Stephenson's brother-in-law. Jack Stephenson was payee of three, totaling $4,820. The cashier's checks were all issued February 26, 1963. Roberts' checks were delivered to him that day.

In November, 1962, Roberts had loaned Stephenson Industries $12,000 obtained for that purpose from Jack Stephenson. When Roberts received the $12,000 in return of his loan, he, in turn, paid the money back to Jack Stephenson.

On March 6, 1963, Stephenson Industries filed a voluntary petition in bankruptcy. Subsequently, Jack Stephenson turned over the entire amount garnered from the Highway check to the trustee in bankruptcy appointed for Stephenson Industries.

Plaintiffs brought this suit against defendants personally. While the complaint and the trial tran-

script contain references to charges of fraud and conspiracy against Messrs. Stephenson and Hillis, both the pleadings and pretrial statement assert plaintiffs' claim to an interest in the Highway check. The arrangement reflected in the letters was referred to by the plaintiffs as one "for the purpose of security and assurance" (in the complaint), "an assignment of the checks to the plaintiffs as a security" (pretrial statement) and as a "security transaction or assignment" and as creating a "security interest" (at the time of trial). The complaint referred to the diversion of the proceeds of the check as an act of "conversion"; the amended answer and "defendant's version" in the pretrial statement denied that the funds were "converted."

After hearing plaintiffs' evidence, the trial judge concluded they could not prove their claims and the trial terminated with a judgment of no cause of action. The trial judge regarded the arrangement between plaintiffs and Stephenson Industries as "totally illusory. It said they were going to pay if the funds got on deposit.    *    *    *    They got the bank to agree that if they did deposit the checks, they would  disburse the money on proper present-. ment of Stephenson's checks, but Stephenson never put it in writing that they would deposit the money."

Plaintiffs appeal, claiming the evidence was sufficient to establish an equitable lien on the proceeds of the check and, that being established, the defendants, who participated in the destruction of that property interest, are personally liable for their tortious conduct.

## 1.

Pomeroy provides the most authoritative general statement of the applicable law:

"The doctrine [of equitable lien] may be stated in its most general form, that every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees, and purchasers or encumbrancers with notice.   Under like circumstances, a merely verbal agreement may create a similar lien upon personal property."   4 Pomeroy's Equity Jurisprudence, § 1235, p 696.

In this context, then, an equitable lien arises from an agreement that both identifies property and evidences an intention that such property serve as security for an obligation.   The rule, as stated by Pomeroy, is well supported by both Federal and State authorities and finds expression in several Michigan cases which paraphrase Pomeroy's Statement (*Kelly* v. *Kelly* [1884], 54 Mich 30, 47; and *Cheff* v. *Haan* [1934], 269 Mich 593, 598, 599).

We could now turn to application of the rule to the facts in this case were it not for the writings of Mr. Justice Swayne, speaking for the United States Supreme Court, in 3 relatively early decisions which language was quoted in *Grand Rapids Trust Co.* v. *Reliable Coal & Mining Co.* (1927), 238 Mich 248, a precedent much relied upon by the defendants.

In *Wright* v. *Ellison* (1863), 68 US 16, 22 (17 L Ed 555, 557), the Supreme Court of the United States declared it was essential "that there should be a distinct appropriation of the fund by the debtor, and

an agreement that the creditor should be paid out of it."

Next came *Christmas* v. *Russell's Executors* (1871), 81 US 69, 84 (20 L Ed 762, 764), where the court declared:

"An agreement to pay out of a particular fund, however clear in its terms, is not an equitable *assignment;* a covenant in the most solemn form has no greater effect. The phraseology employed is not material provided the intent to transfer is manifested. Such an intent and its execution are indispensable. *The assignor must not retain any control over the fund—any authority to collect, or any power of revocation.* If he do, it is fatal to the claim of the assignee. The transfer must be of such a character that the fund-holder can safely pay, and is compellable to do so, though forbidden by the assignor. Where the transfer is of the character described, the fund-holder is bound from the time of notice. [Citations omitted] A bill of exchange or check is not an equitable assignment *pro tanto* of the funds of the drawer in the hand of the drawee. [Citation omitted] But an order to pay out of a specified fund has always been held to be a valid assignment in equity and to fulfill all the requirements of the law." (Emphasis supplied.)

And a few years later in *Trist* v. *Child* (1875), 88 US 441, 447 (22 L Ed 623, 624):

"But a mere agreement to pay out of such fund is not sufficient. Something more is necessary. There must be an appropriation of the fund *pro tanto,* either by giving an order or by transferring it otherwise in such a manner *that the holder is authorized to pay the amount directly to the creditor without the further intervention of the debtor."* (Emphasis supplied.)

The requirement of "distinct appropriation" thus bloomed into the tests of "control," "power of revoca-

tion," "power of collection," "order upon the fund," and "direct payment to the creditor," all to be weighed against a mere promise.

That those "tests" are subordinate to the determination of the chief questions of agreement, property identification and intent to charge the property as security, we know from later decisions of the United States Supreme Court itself. *Walker* v. *Brown* (1897), 165 US 654 (17 S Ct 453, 41 L Ed 865); *Ingersoll* v. *Coram* (1908), 211 US 335 (29 S Ct 92, 53 L Ed 208); *Sexton* v. *Kessler* (1912), 225 US 90 (32 S Ct 657, 56 L Ed 995); *Barnes* v. *Alexander* (1914), 232 US 117 (34 S Ct 276, 58 L Ed 530); *Valdes* v. *Larrinaga* (1914), 233 US 705 (34 S Ct 750, 58 L Ed 1163). Similarly, see the earlier case of *Wylie* v. *Coxe* (1853), 56 US 415 (14 L Ed 753).

In *Ingersoll, Barnes, Valdes* and *Wylie* the court was untroubled by the facts that the funds were non-existent at the time of agreement and that the promisors retained control of the funds when they came into being.[2] In *Walker*[3] and *Sexton*[4] the prom-

---

[2] The equitable lien, as opposed to the common-law lien, allows the property to remain in the hands of the promisor, who has a proprietary interest in it. 33 Am Jur, Liens, § 4, 4 Pomeroy's Equitable Jurisprudence, § 1233.

[3] In *Walker*, a third party, the owner of municipal bonds pledged to a bank to secure the bank's loan to the debtor, promised the plaintiff creditor that the bonds would remain at the risk of debtor's business so far as any claims creditor may have against debtor until creditor's claims were paid. On that basis the creditor extended additional credit to the debtor. The court held that the lien attached just as soon as the bonds were freed from their primary obligation to the bank.

[4] In *Sexton*, an English firm requested a New York firm to set aside securities to secure payment of an indebtedness owed by the New York firm to the English firm. The New York firm placed the securities in its vault. The securities were in such form that they could be negotiated by delivery, and the New York firm retained a right of "possible substitution and perhaps * * * of partial withdrawal." Four years later the English firm took possession, just several days before the New York firm went into bankruptcy. The court found a lien, which attached before the bankruptcy "voidable preference" period.

isors had control of the negotiable securities with respect to which the Supreme Court held the promisees enjoyed an equitable lien.

"To dedicate property to a particular purpose, to provide that a specified creditor and that creditor alone, shall be authorized to seek payment of his debt from the property or its value, is unmistakably to create an equitable lien." *Walker* v. *Brown* (1896), 165 US 654, 666 (17 S Ct 453, 457, 41 L Ed 865, 871), cited approvingly in *Wiltse* v. *Schaeffer* (1950), 327 Mich 272, 285.

In *Walker* v. *Hartford Realization Co.* (CA 2, 1934), 74 F2d 56, 57, the court observed that, while there were authorities (such as *Trist* v. *Child, supra, Christmas v. Russell's Executors, supra,* and *Wright* v. *Ellison, supra*) which have been cited for the view that an equitable lien will only be imposed where there is an "agreement to *assign* a fund present or future" (emphasis supplied), insofar as those cases differ from *Barnes* v. *Alexander, supra, Barnes* would be deemed the controlling authority. The agreement in *Walker* v. *Hartford Realization Co.,* provided that an attorney was to be paid "from the assets when recaptured by the committee." The court rejected the contention that an equitable lien could not attach to a fund not presently in existence, favorably citing *Wylie* and *Ingersoll,* and declared that "an agreement to pay out of an identifiable fund when it shall come into being gives rise to a lien."[5]

[5] The cases (*e. g., Wylie* v. *Coxe, supra, Barnes* v. *Alexander, supra, Walker* v. *Hartford Realization Co., supra*), where attorneys were the successful claimants, clearly are true equitable lien cases and not mere variations on the charging and retaining lien concepts. Charging and retaining liens arise by reason of the lawyer-client relationship independently of express agreement, while, in the cited cases, the equitable lien was dependent on a finding of express agreement. In *Wardman* v. *Leopold* (CADC 1936), 85 F2d 277, the court rejected the contention that the equitable lien concept is

It is now well settled that nonexistence of the fund at the time of the agreement does not prevent establishment of an equitable lien on the fund, and that an equitable lien may attach to after-acquired property.    33 Am Jur, Liens, § 13; 4 Pomeroy's Equity Jurisprudence, § 1236.[6]

The statements concerning retention of control, power of revocation, power of collection, order upon the fund and direct payment to the creditor found in *Wright v. Ellison, supra; Christmas* v. *Russell's Executors, supra;* and *Trist* v. *Child, supra,* were all dicta.

In *Wright* v. *Ellison, supra,* the court observed (p 22) : "The evidence in the case is wholly silent as to any agreement touching the compensation of complainant.    It is nowhere intimated what he was to receive, or when or how he was to be paid."    The claimant there had thus failed to establish either an agreement for compensation or that a portion of the fund in question would stand as security for payment of such compensation.

In *Christmas* v. *Russell's Executors, supra,* the notes in respect to which the equitable interest was claimed had passed to the debtor's son; it does not appear from the opinion whether the transfer was donative or supported by consideration.    The son

---

to be limited to attorneys.    We find no such limitation expressed in Pomeroy.    Compare *Schrot* v. *Garnett* (1963), 370 Mich 161, where the court held that an attorney had an *equitable* lien in part to cover agreed attorney's fees of $100.

[6] "It is familiar learning—one might almost say, folk-law—that a 'mere expectancy' cannot be effectively assigned—transferred, that is, in such a way that the assignee will automatically and without taking any further act have rights superior to those of a creditor who attaches or an assignee who takes his assignment at the moment when the expectancy comes in.    Examination of the older cases * * * reveals that the proposition usually appears as a sort of background accompaniment.    It is an ultimate philosophical premise, assumed without being inquired into—a constant which the variables of particular fact situations approach as a limiting point.    Its life is dictum, not holding."    1 Gilmore, Security Interests in Personal Property, § 7.12, p 239 (1965).

had dealt with the notes as his own, had entered into a compromise with the maker of the notes and, therefter, hypothecated part of his interest in the remaining indebtedness to still another party. In deciding against the claimant, the court also held that jurisdiction of the controversy before it depended upon diversity of citizenship and the requisite diversity was not present.

In *Trist* v. *Child, supra,* the agreement before the court was found invalid, forbidden by act of Congress.

In *Barnes* v. *Alexander, supra,* Mr. Justice Holmes, speaking for the court, referred to the earlier decisions of the Swayne court and observed that it would seem *Wylie* v. *Coxe, supra,* had been overlooked (p 120):

"The remarks in *Trist* v. *Child* were not necessary to the decision, which was placed mainly on other grounds, so that at least we are warranted in treating the question as at large."

In Barnes, the court held that an oral declaration by one attorney to another attorney: "If you will attend to this case, I will give you one third of the [contingent] fee which I have coming to me" created a lien in favor of the promisee. The court declared (p 120):

"We start, however, with the principle that an informal business transaction should be construed as adopting whatever form consistent with the facts is most fitted to reach the result seemingly desired."

The court met head-on the contention that there had been a failure to use "present words of transfer," and that the language was "of contract rather than of conveyance," stating (p 121):

"The important thing is not whether they used the present or future tense, but the scope of the con-

tract. In this case it aimed only at the fund. *Barnes* gave no general promise of reward; he did not even give a promise qualified and measured by success to pay anything out of his own property, referring to the fund simply as the means that would enable him to do it [citation omitted]. He promised only that if, when, and as soon as he should receive an identified fund, one third of it should go to the appellees. But he promised that. At the latest, the moment the fund was received the contract attached to it as if made at that moment. It is an ancient principle even of the common law that words of covenant may be construed as a grant when they concern a present right. [citations omitted] *And it is one of the familiar rules of equity that a contract to convey a specific object even before it is acquired will make the contractor a trustee as soon as he gets title to the thing.*" (Emphasis supplied.)

In *Wright, Christmas* and *Trist,* the court spoke indiscriminately of equitable assignments and equitable liens as if they were interchangeable concepts.[7] They are not, and it is this merging of concepts which appears to have led to a great deal of the confusion we find in the cases. The early State and English precedents relied on in *Wright, Christmas* and *Trist* largely concerned property in the hands of a third party and the effect to be given an order upon the third party for payment to the claimant. In such a case it is understandable that, with a view to protecting the holder of the property against claims that he has failed to follow instructions, the courts have required greater clarity of expression than where the

---

[7] See 33 Am Jur, Liens §§ 3, 19. See, also, *Tobin* v. *Insurance Agency Co.* (CA 8, 1935), 80 F2d 241, 243, wherein the court stated: "A lien is distinguished from an assignment in that it is a charge upon property, while an assignment creates an interest in property. An equitable lien is unlike an equitable assignment because the lien, although not a title, is nevertheless a charge or security upon property."

dispute is solely between the parties to the agreement themselves. It is similarly understandable that, where the property is in the hands of a third party, the courts have thought in terms of assignment rather than lien. We also note that many of the cases cited in *Wright, Christmas* and *Trist* were suits between contending lien claimants, *e. g., Rogers* v. *Hosack's Executors* (1837, NY), 18 Wend 319 (the lower court's opinion is reported at 6 Paige 415). In *Rogers,* the court thought that a common-law right of retainer in favor of the holder of the fund had, as a matter of law, priority over the claimed equitable lien, but irrespective of the dictum in *Rogers,* relied on in *Christmas* and *Trist,* the equitable lien claimants prevailed as to the remainder of the fund.

We also note the equitable assignment and the equitable lien have different histories, which may well explain both the differences in results reached and in the explanations of those results by the courts reaching them. The doctrine of equitable lien is a rule of substantive law, grounded on equitable principles, which recognizes or declares a security interest based upon the agreement or, in certain kinds of cases not here relevant, the relationship of the parties, even though such security interest is imperfect and may be given only limited priority where the rights of third parties have intervened. 4 Pomeroy's Equity Jurisprudence (ch 7, § 1233, *et seq.*), p 691, *et seq.*; 53 CJS, Liens, § 4; *Cheff* v. *Haan* (1934), 269 Mich 593, 598; *Kelly* v. *Kelly* (1884), 54 Mich 30, 47. The origin of the equitable assignment is procedural rather than substantive. It is an outgrowth of equity's enforcement of nonnegotiable choses in action, expectancies and other interests which common-law courts originally would not enforce. 6 Am Jur 2d, Assignments, § 7; 4 Pomeroy's

Equity Jurisprudence, § 1270, p 787; 1 Gilmore, Security Interests in Personal Property, § 7.3, p 200.

It does appear there is authority for the view that a distinction is to be drawn between an order on a future fund which operates as an equitable *assignment* and a mere promise to appropriate an existing or future fund, or to give an order on such a fund (4 Pomeroy's Equity Jurisprudence, § 1283a, p 813; 6 Am Jur 2d, Assignments, § 88, p 269), and that *Trist* v. *Child, supra,* and *Chistmas v. Russell's Executors, supra,* are two of the leading cases cited in support of that distinction. Unfortunately, all the authorities[8] have not recognized the inapplicability of these principles in a case where a claim of equitable *assignment* is not asserted, the duties of a holder of the fund are not involved, the rights of third parties have not intervened, and other equitable considerations are present justifying the recognition of an equitable lien.

We know from *Barnes* v. *Alexander, supra,* that, whatever may be the reasons for the requirements previously mentioned applicable to equitable *assignments,* which may not be applicable in all events even to equitable assignments,[9] the life of the equitable lien is not dependent on words of conveyance or the use of particular phraseology, and that an agreement indicating an intention that identified property shall secure a debt is sufficient. Merely because the operative language may fail as an equitable assignment does not preclude the court from finding the requisite intention to designate particular property as security for a debt, or from declar-

---

[8] Compare, for example, the statement in as highly regarded a source as 33 Am Jur, Liens, § 20.

[9] See 6 Am Jur 2d, Assignments, § 88, p 270, following n 11; see, also, the second and third sentences in the quotation above from *Christmas* v. *Russell's Executors, supra;* and *Merchants' National Bank* v. *Gregg* (1895), 107 Mich 146, 148; and *The Preston National Bank of Detroit* v. *Purifier Co.* (1890), 84 Mich 364, discussed *infra.*

ing that the particular property has been subjected to an equitable lien. The doctrine being one of substantive law, the claimant of an equitable lien must, of course, satisfy the court that, in equity and good conscience, he is entitled to the lien. *Cheff v. Haan, supra.*

In *Grand Rapids, supra,* our Supreme Court, in noting there an absence of a present transfer of accounts, emphasized, as factors to be weighed against the asserted equitable lien, that the assignor of the accounts retained the right to collect the accounts and the absence of an equitable assignment. The court referred to the declarations of the United States Supreme Court in *Christmas v. Russell's Executors, supra,* and *Wright v. Ellison, supra.* In *Grand Rapids,* the Court considered neither the United States Supreme Court holding in *Wylie v. Coxe, supra,* which was prior in time to *Christmas* and *Wright,* nor the relevant United States Supreme Court declarations in *Walker v. Brown, supra, Ingersoll, supra, Sexton, supra, Barnes, supra,* and *Valdes, supra,* subsequent to *Christmas* and *Wright.* While the decisions of the United States Supreme Court are not binding on the courts of Michigan on common-law questions, a court's verbalization of a rule of law must be read in the light of that court's other significant declarations and holdings on the same subject.

Nor may the language used in any case be fairly divorced from the facts. *Grand Rapids* was a suit by a trustee in bankruptcy to recover accounts assigned 2 days before the bankruptcy petition was filed. The creditor holding the accounts pleaded that an earlier oral agreement, one outside the voidable preference period, created an equitable lien in his favor on the accounts. The court found no lien existed. In *Grand Rapids,* the oral agreement was in alternative terms, the bankrupt agreeing that the

creditor would be paid "either in cash or by assignment of customer's accounts." (p 250)   The bankrupt made partial payment by check, and only when a second check was returned by the bank for lack of funds did the bankrupt, on the eve of bankruptcy, assign in purported resolution of the *debtor's* alternative option as to the method of payment, "the effect (of which) was to give the bankrupt a choice in method of payment." (p 252)   The oral agreement relied upon did not mention any specific accounts, and it was not claimed that the agreement was to assign all the debtor's accounts.[10]

In *Union Trust Company* v. *Bulkeley* (CA6, 1907), 150 F 510, 516, the bankrupt agreed to assign all existent and future accounts receivable to the creditor, after the creditor had refused to act as indorser on several notes without some form of security.   The court purportedly applied Michigan case law, albeit prior to *Grand Rapids,* and held that the agreement there constituted an equitable lien upon the funds claimed:

"If any contract was made, it was one which became of its own force operative as a lien.   It is true that the subject to be affected by it was to be *thereafter acquired; but, when acquired, it would become subject to the lien without any new or further agreement."* (Emphasis supplied.)[11]

---

[10] In *Gogebic Auto Co., Inc.,* v. *Gogebic County Board of Road Commissioners* (1940), 292 Mich 536, also relied upon by the defendants, the court held that an exclusive agency contract does not suffice by itself to create an equitable assignment of the commission portion of the purchase price in favor of the agent.

[11] Compare *Geddes* v. *Reeves Coal & Dock Company* (CA 8, 1927), 20 F2d 48.   In 1919, Reeves agreed "to pay George E. Geddes 50% of any refunds received by us from overcharges on freight bills delivered to him for auditing."   The court held Geddes had an equitable lien upon the funds, the lien attaching as soon as the funds came into existence.   Reeves' receivers took the funds as Reeves would have taken them, in trust for Geddes.   It was not relevant that Geddes did not collect the funds.

The district judge in *Union Trust Company* cited *Merchants' National Bank* v. *Gregg* (1895), 107 Mich 146, 148, where the court stated that an equitable assignment can be made "by any words or acts showing a clear intention to assign," and *The Preston National Bank of Detroit* v. *Purifier Co.* (1890), 84 Mich 364, where the court declared, with respect to continuing assignments of accounts receivable, which by their very nature are assignments of property not subject to precise description and not entirely currently in existence (p 387):

"If the agreement is sufficiently definite and certain so that the *intention* of the parties can be determined, then the courts can specifically enforce it, if it be also one that ought to be enforced. * * * The right of a debtor to give security upon property to be by him afterwards acquired in the course of business has been recognized in this State in numerous cases." (Emphasis supplied.)

While these statements by our Supreme Court were made in other contexts, and concern assignments not liens, as general propositions they seem to us to fit very well in the present setting.

Michigan has recognized the equitable lien in the following applications: *Schrot* v. *Garnett* (1963), 370 Mich 161 (where client reneged on promise to execute $350 mortgage on his home to secure payment of $250 child support money arrearages advanced by attorney, plus attorney's fees of $100); *Tustin Elevator & Lumber Co.* v. *Ryno* (1964), 373 Mich 322 (where owner told subcontractor that he would be paid out of escrow, and subcontractor was not so paid and did not protect his mechanic's lien rights); *Drettmann* v. *Marchand* (1953), 337 Mich 1 (borrower failed to execute chattel mortgage as promised). See, also, *Van Camp* v. *Van Camp*

(1939), 291 Mich 688, 696, and *Peters* v. *Brooks* (1963), 370 Mich 363.

After threading through the precedents, one finds most appealing Mr. Justice Holmes' candid statement in *Sexton* that (pp 98, 99): "the phrase 'equitable lien' may not carry the reasoning further or do much more than express the opinion of the court that the facts give priority to the party said to have it." Pomeroy expressed much the same thought:

"The form or particular nature of the agreement which shall create a lien is not very material, for equity looks at the final *intent* and purpose rather than at the form; and if intent appear to give, or to charge, or to pledge property, real or personal, as a security for an obligation, and the property is so described that the principal things intended to be given or charged can be *sufficiently identified,* the lien follows." 4 Pomeroy's Equity Jurisdiction § 1237 (5th ed), p 702.   (Emphasis supplied.)

### 2.

We return to the transactions between Stephenson Industries and the plaintiffs. It is contended that under the letters to the Bucyrus bank and to Warren Tool, Stephenson Industries was as free as before to withhold deposit of the Highway check in the bank. We are asked to look upon the letters as, at most, a courtesy without consequence.

We entertain a different view. The plaintiffs insisted upon obtaining meaningful security before they would do any work. They accepted the letter to the Bucyrus bank on the understanding that that objective had been achieved, that plaintiffs' economic interest as well as Stephenson Industries' image would be protected. The letters specifically named the Highway orders by number and the amounts due on those orders; they set out that Stephenson

Industries owed a designated amount to plaintiffs and that the obligation was to be satisfied upon deposit of the Highway checks and payment by the bank of the proceeds of such checks. To this point the defendants concur, but here they assert that no security interest arose even when the Highway check was received by Stephenson Industries, and that none could arise until Stephenson Industries elected to deposit the check in the bank. That argument carries small weight logically and none equitably.

Where the parties agree that a clearly identified fund secures an obligation, that agreement gives rise to a lien upon the fund. The cases tell us that the nonexistence of the fund at the time of the agreement is not necessarily consequential. The lien attaches not later than when the fund comes into existence or comes under the control of the promisor who has charged it with that obligation. The promisor takes the fund in accord with the agreement, "as trustee as soon as he gets a title to the thing." *Barnes* v. *Alexander, supra,* p 121. It would not matter that Stephenson Industries failed expressly[12] to promise to deposit the check, for, having agreed that a specific fund, the proceeds of the Highway check, would serve as security for the obligation, it necessarily took the check, which evidenced the right to the fund, subject to the obligation to make that deposit.

In *Porter* v. *Searle* (CA10, 1955), 228 F2d 748, 750, the purchaser of an entire stock of merchandise failed to perform his agreement "immediately" to execute a chattel mortgage to secure payment of the purchase price. The Court held:

---

[12] We note a Warren Tool partner testified that, at the time the security arrangement here was negotiated, Mr. Stephenson told him that, upon receiving the Highway check, he would deposit it with the Bucyrus bank.

"The agreement to give immediately the chattel mortgage and the *failure* of [purchaser] to do so created an equitable lien in favor of the [seller] on the stock of merchandise." (Emphasis supplied.)

Similarly, in *Blumin* v. *Ellis* (1966, Fla), 186 So 2d 286, the court found an equitable lien in favor of a seller covering the property sold, where the purchaser had a 6-months' option to pay $700,000 in securities or to secure payment of that amount by a purchase money mortgage and, if the purchaser failed to exercise such option, the seller could demand the mortgage.[13]

In *Theatre Realty Co.* v. *Aronberg-Fried Co., Inc.* (CA8, 1936), 85 F2d 383, the court held that the rights of bondholders in a fund held by a bank to pay building costs under an indenture in default, which indenture obligated the bank, upon default, to apply the then balance of the fund for the benefit of the bondholders, were rights subordinate to the rights of an unpaid contractor who, although not a party to the arrangement, acted in reliance thereon. All preconditions to the bank's obligation to pay the contractor had occurred prior to the default on the bonds, except for a written request for payment by the obligor on the bank. The court counted the lack of the obligor's request for payment by the bank to the contractor of no consequence, since there was no valid reason for the obligor's failure to make such request. The court declared, in language equally apt to defendants' failure here to deposit the Highway check (p 387):

"Since there was no excuse for the [obligor] company's failure in this respect, equity will re-

---

[13] The opinion of the court is silent as to whether the seller made such demand, but, reading between the lines, it would appear that the seller had not.

gard that as done which ought to be done for the purpose of effecting justice.[14] * * * Nothing is to be gained by any quibble over the nature of such equitable right. There is present here every element of a conditional equitable assignment and also of an equitable lien."

Had Stephenson Industries been prevented by creditor action or bankruptcy from depositing the check, plaintiffs' claim would probably have remained inchoate or inoperative. Had the check upon its receipt been ignored or simply neglected, a similar construction might have been in order with the result that the failure to deposit the check would have constituted only a breach of contract, for which corporate officers and agents generally are not personally liable.

It appears on the record so far made that the facts here are quite the contrary. The Highway check, upon its receipt, became the focus of considerable cogitation at Stephenson Industries,— should it be deposited in the bank or should it be diverted? When it was diverted, Stephenson Industries did more than breach an ordinary agreement to pay. It deliberately destroyed the specific security which plaintiffs, pursuant to assurance from Stephenson Industries, had relied on for payment. Plaintiffs did not extend general credit to Stephenson Industries and then afterward extract a promise of security. The record so far made indicates there never would have been any performance by the plaintiffs but for the representation that

---

[14] The doctrine of equitable lien "is clearly an application of the maxim, equity regards as done that which ought to be done." 4 Pomeroy's Equity Jurisprudence, § 1235, pp 697, 698. For applications of that maxim under Michigan law, see *Butler* v. *Attwood* (CA 6, 1966), 369 F2d 811, 818, praising the articulation of that principle by our Supreme Court in *Kent* v. *Klein* (1958), 352 Mich 652, 656, where the Supreme Court held that "equity * * * regards that as seen which ought to be seen, and, having so seen, as done that which ought to be done."

the letter to the bank was more than the ordinary
promise to pay, that it was, indeed, security. To
hold that Stephenson Industries merely breached
a contract when it intentionally extinguished the
interest in property, choate or inchoate, which it
had previously purported to dedicate to plaintiffs,
would be to enshrine form and to ignore substance.

In several cases where an equitable lien was
found, the courts emphasized that the claimant re-
lied on the fund rather than on the personal respon-
sibility of the debtor. *Wylie* v. *Coxe, supra; Inger-
soll* v. *Coram, supra; Barnes* v. *Alexander, supra.*
In the case at bar, Stephenson Industries was the
primary obligor, but plaintiffs had refused to pro-
ceed in reliance on its personal responsibility. The
purpose of the letters to the bank and Warren Tool
was to provide security that, in fact, would be the
primary means of payment. Compare *Theatre
Realty Co.* v. *Aronberg-Fried Co., Inc., supra,* where
the court observed (p 388):

"The evidence abundantly shows that plaintiff
relied from the beginning upon the trust fund for
his pay and not upon the Company."

We find on the record so far made a comparable
reliance here.

We also note that the existence of a legal remedy
does not prevent equity from decreeing a more com-
plete remedy. In *Wylie* v. *Coxe, supra,* the court
observed (p 419): "There may be a legal remedy,
and yet if a more complete remedy can be had in
chancery, it is a sufficient ground for jurisdiction."
Similarly, the court of appeals of Maryland, in
*Keyworth* v. *Israelson* (1965), 240 Md 289 (214 A2d
168), after acknowledging that the covenant there
created a personal obligation that would support an
action at law, stated it did not necessarily follow
that the covenant did not at the same time give rise

to an equitable lien. In *Keyworth,* an injured employee sought to avoid an authorization to his attorney to pay to the employee's employer, out of the proceeds of any judgment obtained by the employee against a third party, the $100 a week the employer had advanced the employee pursuant to an agreement between the two. The court declared an equitable lien in favor of the employer.

Pomeroy similarly reports that the doctrine of equitable lien

"was introduced for the sole purpose of furnishing a ground for the specific remedies which equity confers, operating upon particular identified property, instead of the general pecuniary recoveries granted by courts of law. It follows, therefore, that in a large class of executory contracts, express and implied, which the law regards as creating no property right, nor interest analogous to property, but only a mere personal right and obligation, equity recognizes, *in addition to the personal obligation,* a peculiar right over the thing concerning which the contract deals, which it calls a 'lien,' and which, though not property, is analogous to property, and by means of which the plaintiff is enabled to follow the identical thing, and to enforce the defendant's obligation by a remedy which operates directly upon that thing." 4 Pomeroy's Equity Jurisprudence § 1234, p 695 (5th ed). (Emphasis supplied by author.)

3.

When Stephenson Industries deliberately obliterated plaintiffs' interest in the check, it would appear on the present record that it converted property belonging to the plaintiffs which had a value of $16,820. A negotiable instrument may be the subject of a suit for conversion (*Rose* v. *Lewis* (1862), 10 Mich 482), and one who is authorized to collect

a note and remit the proceeds may be sued for conversion if he collects but does not remit the proceeds. *Hogue* v. *Wells* (1914), 180 Mich 19, 24, 31.

However, where there is no duty to pay the plaintiff the specific moneys collected, a suit for conversion may not be maintained. *Anderson* v. *Reeve* (1958), 352 Mich 65, 69, 70. As a general proposition, conversion is an intentional tort (See Restatement of Torts 2d, § 223)[15] in the sense that the defendant's action must be willful, although one can commit the tort unwittingly if he is unaware of plaintiff's outstanding property interest. 1 Harper and Jones, The Law of Torts, § 2.10, p 126.

The burden imposed on one claiming that another has converted a fund coming into such other person's possession, on which fund the claimant asserts an equitable lien, to establish a duty on the part of the fund-collector to pay over the specific moneys collected (as a necessary element of a conversion) and that the moneys have been particularly designated and dedicated to the claimant (as a necessary element of an equitable lien) express but the same fundamental legal concept; and it would seem that the proofs necessary to establish such elements would be substantially the same. As to both such elements, we look to the agreement of the parties. As with every agreement, we are concerned less with the form of the agreement than with the intention of the parties as it appears from all the relevant evidence.

Whether the rule of *Anderson* v. *Reeve, supra,* has any application here is, of course, a factual question to be resolved on the evidence on remand. In *Anderson* v. *Reeve,* the court emphasized that none of the defendants were involved in the act

---

[15] As to whether negligent conduct can be the basis of a suit charging conversion, compare 18 Am Jur 2d, Conversion, § 4, with Restatement of Torts 2d, § 224.

complained of, and that there was no proof that the specific moneys had been fully received.

This much, however, already appears here. The moneys represented by the check were in fact collected. In diverting the Highway check, Stephenson Industries willfully diverted the moneys represented by that check, and one or both the defendants participated in that deed. The diverted moneys were specifically allocated in the letters to the plaintiffs. Stephenson Industries had no retained right to use such moneys in its business. The plaintiffs did not agree to allow Stephenson Industries to collect such moneys and account therefor at a later time. Accordingly, the rule expressed in *Anderson* v. *Reeve* does not have any application on the present record.

4.

It is a familiar principle that the agents and officers of a corporation are liable for torts which they personally commit, even though in doing so they act for the corporation, and even though the corporation is also liable for the tort. *Zaino* v. *North Woodward Construction Company* (1959), 355 Mich 425, 429 (fraudulent representations); *Allen* v. *Morris Building Company* (1960), 360 Mich 214, 218 (willful change in natural flowage of water); *Wines* v. *Crosby & Co.* (1912), 169 Mich 210, 214 (active promotion and sale of a compound known to be dangerous); *Bush* v. *Hayes* (1938), 286 Mich 546, 549 (conversion); *Hempfling* v. *Burr* (1886), 59 Mich 294, 295 (fraud).

The result required by that principle is not affected by the fact that, after bankruptcy proceedings had been instituted, Jack Stephenson turned over to the corporation's trustee all the moneys he had obtained from the proceeds of the Highway check. Corporate officers are not excused from personal liability for the conversion of other people's

property simply because the corporation benefits
from the wrong and because the corporate officers
realize no personal profit from their acts of conver-
sion.  3 Fletcher Cyc Corp, §§ 1140, 1151 (perm ed);
*Bush* v. *Hayes, supra; Hirsch* v. *Phily* (1950), 4
NJ 408 (73 A2d 173, 177) (conversion of proceeds
of assigned accounts receivable).

5.

Although it was not argued, we believe ourselves
obliged to consider whether the doctrine of equitable
lien survived the enactment of article 9 of the
uniform commercial code.  PA 1962, No 174, § 9203[16]
provides that a nonpossessory security interest is
not enforceable against the debtor or third parties,
unless the debtor has signed a security agreement
which contains a description of the collateral.

The letter to the bank signed by Stephenson In-
dustries is, of course, a writing signed by the debtor
and it describes the collateral.  Whether the letter
is a security agreement—defined in PA 1962, No
174, § 9105[17] as "an agreement which creates or pro-
vides for a security interest"—is, of course, fun-
damentally the same question already dealt with in
this opinion.

The official comment to section 9203[18] suggests
that the equitable mortgage may be passé.  That
comment appears, however, to be directed to a parol
agreement, or one which, unlike the letter here, does
not otherwise comply with the relatively simple
requirements of section 9203.

We also note Professor. Gilmore acknowledges
that

"the author, in his capacity as treatise writer,
would like to suggest that, in his earlier capacity

---

[16] MCLA § 440.9203 (Stat Ann 1964 Rev § 19.9203).
[17] MCLA § 440.9105 (Stat Ann 1964 Rev § 19.9105).
[18] Reprinted as annotation to Stat Ann 1964 Rev § 19.9203.

as comment writer for article 9, he overshot the mark. In our discussion of the term 'security interest,' we made the point that * * * the courts would have to continue to find their way through the jungle of 'equitable liens'; that there will be security interests 'within this article' as well as 'interests in property which secure obligations' which are outside the article. It may be predicted that the statute of frauds of section 9–203 will be no more successful than any other statute of frauds has ever been in making hard problems go away and that doing away with the 'equitable mortgage' will not be as easy as the section 9–203 comment suggests." Gilmore, 1 Security Interests in Personal Property (1965), § 11.4, pp 345, 346.

Elsewhere Professor Gilmore states:

"Article 9, for all its comprehensiveness, is a statute drafted to regulate certain well-known or institutionalized types of financing transactions. It is fair enough to say that a transaction which sets out to be one of those types should conform to the article 9 rules or fall by the wayside. But beyond the area of institutionalized transaction, there stretches a no-man's land, in which strange creatures do strange things. For these strange things there are no rules; it makes no sense to measure them against the rules which professionals have developed for professional transactions. The best that can be done is to let the courts pick their way from case to case, working out their solutions *ad hoc* and *ad hominem*." Gilmore, *supra*, § 11.2, pp 336, 337.

We are so persuaded. The parties here did not profess to establish a security good against the world, or indeed beyond their own relationship. It was an unconventional security arrangement, one good only between the plaintiffs and Stephenson Industries and those who might have knowledge

thereof.[19]   There is no reason to require that the compact before us be governed by provisions principally designed to achieve clearer perfection and to determine competing priorities of security devices daily employed in commerce.

### 6.

The trial terminated before defendants had an opportunity to offer proofs. This case is, accordingly, remanded for a new trial.

We reiterate that while the facts before us are undisputed, and the essential facts on which plaintiffs rely were conceded by Jack Stephenson on cross-examination when called as a witness for the plaintiffs, we have written solely on the record before us, recognizing that on remand it will be the trial judge's function to find the facts, and it is beyond our function to do so.

Reversed and remanded for a new trial.

BURNS and McGREGOR, JJ., concurred.

---

[19] See *Benedict* v. *Ratner* (1925), 268 US 353 (45 S Ct 566, 69 L Ed 991) for principles which, in the absence of any applicable statute, have been applied to protect the rights of the debtor's creditors where the debtor retained unfettered dominion over the collateral. The inapplicability of the *Benedict* v. *Ratner* doctrine in a case such as that now before us is discussed in *Burrowes* v. *Nimocks* (CA4, 1929), 35 F2d 152.