**TUMAC LUMBER COMPANY, INC.,
et al., Plaintiffs.**

v.

**UNITED STATES of America,
Defendant.**

**Civ. No. 84–435–RE.**

United States District Court,
D. Oregon.

June 25, 1985.

Curtis W. Cutsforth, G. Todd Norvell, Portland, Or., for plaintiffs.

Charles H. Turner, U.S. Atty., Portland, Or., Mark E. Nebergall, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION

REDDEN, District Judge:

Faced with a balance of payments crisis during 1971, Congress enacted legislation to encourage exports by allowing for the establishment of so-called Domestic International Sales Corporations (DISCs). The applicable Internal Revenue Code sections and later Treasury regulations are complex and unclear.

Plaintiff, Tumac Lumber, is suing the government for a refund of $102,605 in taxes it paid when the Internal Revenue Service determined that assignments of export accounts receivable to Tumac Export, a DISC subsidiary of Tumac Lumber, were improper. The government claims Tumac Lumber assigned promissory notes, not export accounts receivable, to Tumac Export. The important distinction is that accounts receivable are "qualified export assets" and entitled to favorable tax treatment while promissory notes are not. Tumac Lumber argues that the promissory notes were not intended to create an obligation or assignment of notes, but merely to evidence an intention to assign export accounts receivable.

Thus, the issue presented in this case is whether Tumac Export satisfied the qualified export asset test set forth in Section 992(a)(1)(B) of the Internal Revenue Code by receiving, through assignment, export accounts receivable from Tumac Lumber.

I find that Tumac Export satisfied the qualified export asset test.

## I. *Background*

The DISC provisions enacted by Congress are found in Sections 991 through 997 of the Internal Revenue Code. After the enactment of these provisions the Treasury Department and the Department of Commerce began a program to inform the public of the DISC provisions. They issued a handbook on DISCs which was widely advertised and distributed. Workshops discussing the DISC provisions were held throughout the country.

The general approach, greatly simplified, can be explained as follows. To segregate the income to be accorded favorable tax treatment, Congress required that exporters establish new corporations designated as DISCs. Congress then established two formulas for allocating a portion of income from export sales to the DISC. Following one formula an exporter could allocate 50% of the net income from export transactions to the DISC. Under the other formula the exporter could allocate 4% of gross sales to the DISC. Once the DISC's income was determined, one-half of the income was effectively exempt from taxation.

Neither Congress nor the Internal Revenue Service intended that the DISC have any real business substance. Its only function was to permit the identification of the income subject to beneficial tax treatment. DISCs were, for all intents and purposes, merely paper corporations. *See* Revenue Ruling 72–166 (1972).

In establishing a DISC, an exporter would form a corporation under any state law, purchase $2,500 of its stock, open a bank account for the DISC and establish minimal books and records. The exporter would then enter into a short agreement with the DISC whereby income derived from export transactions would be computed under one of the formulas previously described and transferred to the DISC. The parent corporation was intended to do all the actual business including filling orders and collecting bills. DISCs did not

and were not intended to have employees. Customers of the parent corporation did not need to know of the existence of the DISC or its participation in the transaction.

Finally, in receiving favorable tax treatment, the DISC had to satisfy the requirements of Code Section 992(a)(1)(B), the "qualified export asset" test. Briefly, the qualified export asset test requires that at the end of each fiscal year of a DISC, 95% or more of its assets must be "qualified export assets" as defined in Code Section 993(b). That section lists seven different kinds of assets in which a DISC may invest in order to continue the exemption from tax of the accumulated income. Included in the list is export accounts receivable. Code Section 993(b)(3).

## II. *Facts*

Tumac Lumber is a duly incorporated Oregon company which has been engaged in the wholesale lumber distribution business since 1959. Because Tumac was engaged in a substantial amount of export business it formed a DISC subsidiary (Tumac Export) on February 26, 1973 and the DISC adopted a January 31 fiscal year. Thus, as of January 31, 1974, Tumac Export had to satisfy the requirements of Code Section 992(a)(1)(B), the qualified asset test.

On March 1, 1973, Tumac Lumber (Lumber) and Tumac Export (Export) entered into a sales agreement which named Export as Lumber's exclusive sales agent for all sales or dispositions of logs, lumber, timber and forest products that produced qualified export receipts as defined in Internal Revenue Code § 993(a). During the years in issue here, 1976–1978, total export accounts receivable payable to Lumber were as follows:

| | |
|---|---|
| January 31, 1976 | $180,798.27 |
| January 31, 1977 | $260,948.20 |
| January 31, 1978 | $246,861.39 |

Lumber executed interest bearing promissory notes payable to Export on demand in the following amounts:

| | |
|---|---|
| January 30, 1976 | $110,000.00 |
| January 30,1977 | $150,000.00 |
| January 30, 1978 | $208,000.00 |

Lumber received from the District Director, Internal Revenue Service, Portland, Oregon, an examination report dated June 3, 1980, proposing adjustments to the reported income for Lumber's fiscal years 1976 through 1978. The proposed adjustments were based on a finding that Export was not a DISC in those years because it did not hold sufficient qualified export assets. In April 1982, Lumber paid the deficiency judgment in the sum of $122,955.65. Lumber's subsequent claim for a refund of taxes in the aggregate amount of $102,605 paid as a consequence of the unfavorable determination was disallowed by the Internal Revenue Service in June 1982.

Lumber claims that the preparation of documents purporting to be promissory notes was done to evidence the fact and the amount of the assignments of export accounts receivable. Therefore, at all pertinent times, Export was a properly qualified DISC under the applicable tax laws, including Internal Revenue Code §§ 991–997. At no time was there any intention on the part of Lumber or Export to create an indebtedness from Lumber to Export.

The government argues that Lumber did not assign its export accounts receivable to Export, but rather assigned it promissory notes. Export could not be a qualified DISC because assigned promissory notes are not qualified export assets and Export would thus fail the qualified export asset test of § 992(a)(1)(B). I find the government's argument to be without merit.

III. *Discussion*

*U.C.C. Claim*

■ The government argues that an assignment of accounts receivable is governed by Article 9 of the Uniform Commercial Code. The government also contends that an assignment of accounts requires a sufficient writing under U.C.C. Section 9–203(1)(a). The government alleges no such writing existed in this case.

It was not the intention of the U.C.C. drafters that the U.C.C. should apply to transactions such as those between Lumber and Export. Article 9 was drafted to cover situations whereby a borrower pledged certain collateral to a lender in the event he should default on the loan. Another purpose was to provide procedures for the lender to secure his interest in the collateral against third parties to whom the borrower might pledge the same collateral. Not all transactions were intended to be covered by Article 9. *See Warren Tool Company v. Stephenson*, 11 Mich.App. 274, 161 N.W.2d 133 (1968).

■ In the present case, the assignments of the notes were not to secure any obligation owed by Lumber to Export, nor to protect an interest in the notes. The assignments were performed solely in an attempt to satisfy the requirements of the DISC provisions.

The real question is whether or not the assignments of promissory notes were intended to be assignments of accounts receivable. In Oregon an effective assignment need not be in writing.

> An assignment may be oral or written and no special form is necessary provided that the transfer is clearly intended as a present assignment of the interest held by the assignor.

*Matter of Estate of Vaughn*, 38 Or.App. 29, 588 P.2d 1295 (1979). I find that the necessary element of intent to assign the accounts receivable was present in this case.

As mentioned previously, the promissory notes were not intended by Lumber to secure an obligation or create a debt. *See* Schandel deposition, pages 33–34. The accountant for Lumber stated that she felt the company needed some sort of a note to evidence that an assignment of accounts receivable to Export had been made. Schandel deposition, pages 17–18. This method had been recommended by another accounting firm because Lumber's accountant was inexperienced with the formation of DISCs and she wanted to be sure the

correct procedures were followed. Schandel deposition, pages 18, 31. The notes were then prepared, at the request of Lumber's accountant, by an employee of Lumber. The employee also stated that the notes were not intended to create an obligation. Stoinoff deposition, page 10.

The intent to transfer the accounts receivable can also be inferred from the formation of the DISC and the records held by Lumber. Lumber kept records of accounts receivables assigned to Export. Exhibit 8, pages 21–25. Also, Export's tax return lists assets as export accounts receivable.

Lumber's transfer of the accounts receivable may not have been structured perfectly, but it was within the intended purpose. Considering the complexity and novelty of the DISC provisions it is not difficult to expect some procedural errors. The errors in this case do not detract from my finding of an effective assignment. There is no indication that Lumber intended to transfer a set of promissory notes to Export as the government contends. Nor has the government provided any convincing evidence of a sham transaction. The government cites *CWT Farms Inc. v. C.I.R.*, 755 F.2d 790 (11th Cir.1985) in support of its argument. That case dealt with producer's loans. The case does not further the government's position.

*Conclusion*

For the years in question, I find that Tumac Lumber assigned export accounts receivable to Tumac Export. Because 95% or more of Tumac Export's assets were qualified export assets, Tumac Export satisfied the qualified export asset test of section 992(a)(1)(B).