In the Matter of Mark Edward
MICHEL, Charlene Lucille
Michel, Debtors.

Charles G. SKEMP, Plaintiff,

v.

Mark Edward MICHEL, Defendant.

Bankruptcy No. 684–00230.
Adv. No. 684–0130.

United States Bankruptcy Court,
N.D. Ohio.

Aug. 5, 1985.
Amended Order Aug. 13, 1985.

John P. Van Abel, of Amerman, Burt & Jones Co., L.P.A., Canton, Ohio, for plaintiff.

James R. Kandel, Canton, Ohio, for defendant.

## MEMORANDUM OF DECISION

JAMES H. WILLIAMS, Bankruptcy Judge.

The defendant, Mark Edward Michel (sometimes hereinafter debtor or Michel), filed with this court for relief under the provisions of Chapter 7 of Title 11 of the United States Code on March 5, 1984. The plaintiff, Charles G. Skemp (sometimes hereinafter plaintiff or Skemp), timely brought a six-count complaint against the debtor, attacking his right to a discharge in light of the prohibition provisions of 11 U.S.C. § 727(a)(2), (3), (4) and (5) and, alternatively, asserting the nondischargeability of Michel's debt to him under 11 U.S.C. § 523(a)(2) and (4). The defendant answered, denying the significant allegations of the complaint and asserting that the relationship between the parties was that of joint venturers from whose activities the plaintiff benefitted. Ultimately, in the ensuing trial, counts one through four were dismissed, narrowing our consideration to the section 523 dischargeability issues.

## JURISDICTION

This court is empowered, under 28 U.S.C. § 1334(a) and (b) and General Order 84 of the United States District Court for the Northern District of Ohio to hear the within matter and, pursuant to 28 U.S.C. § 157(b)(2)(I) and (J), to enter a final judgment.

## STATUTORY LAW

Section 523(a) of the Bankruptcy Code provides in part as follows:

A discharge ... does not discharge an individual debtor from any debt—

. . . . .

(2) for money ... to the extent obtained, by—

(A) false pretenses, a false representation, or actual fraud ...;

. . . . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny ...

## I

## FINDINGS OF FACT

1. The debtor-defendant was, at all relevant times prior to the filing of his voluntary petition in bankruptcy, a real estate salesman. He holds a degree in accounting from Kent State University. He has no formal training in the field of securities investment.

2. The plaintiff is a civil engineer with an Akron, Ohio-based construction company. During the time the acts herein complained of took place, plaintiff was working on a project for his employer on the Ohio

River which generally allowed him to be home in North Canton, Ohio only on weekends.

3. Plaintiff was concerned about the amount of income tax he was required to pay on his salary. A longtime friend of Skemp, one Bill Stimel, introduced, or at least recommended, the defendant to Skemp. Michel had arranged some real estate investments for Stimel who felt his friend Skemp might benefit from similar investment opportunities.

4. A meeting between the plaintiff and defendant took place at plaintiff's home in late August, 1982. In the ensuing discussion, both real estate and stock investment opportunities were considered. Defendant admits he told Skemp that he had a "plan" for profitably investing in the stock market; Skemp asserts that Michel was "very, very impressive" in his presentation. Michel proposed a scheme of investment, the profits from which he and Skemp would divide on a two thirds-one third basis, Skemp's lesser portion to be in consideration of a lack of risk on his part.

5. No commitments, written or otherwise, were made at the initial meeting. Skemp's only admitted "investigation" of his proposed advisor was to drive by Michel's home, with which Skemp was "impressed." (According to an appraisal by a local professional real estate appraiser, the Michel home had an estimated fair market value on August 12, 1982 of $230,000.00. Skemp testified that Michel represented the home's value at "in excess of $200,000.00"). Skemp requested no financial statement from Michel.

6. The evidence is in dispute about the lapse of time before the next contact between the parties, but it is clear that, by personal check dated August 30, 1982, Skemp's wife, Janet, paid $50,000.00 to the defendant. Plaintiff asserts, and defendant admits, that Michel telephoned Mrs. Skemp at her place of employment to obtain this payment, Skemp by then being at

his out-of-town job. A promissory note dated August 30, 1982 for $50,000.00 due December 31, 1982 with interest at 12% per annum was signed by the defendant and delivered to the plaintiff.

7. A second check for $50,000.00 was turned over to Michel on September 2, 1982 and was evidenced by Michel's promissory note of even date on the same terms as the first note described above.[1] A third check for $50,000.00 and a corresponding note were exchanged on September 27, 1982 and a final exchange of a $20,000.00 check and promissory note, again on identical terms but without interest, took place on or about October 14, 1982. The last amount was repaid in November of 1982, leaving a balance of Skemp's money in Michel's hands entering 1983 of $150,000.00.

8. Skemp began earnest inquiry about the progress of the investment program in late 1982, and early in 1983, Michel turned over to Skemp a total of $30,000.00. Michel proposed a "plan" of repayment which consists of some handwritten figures on a sheet of paper.

9. Those figures were given formality in a promissory note, signed by the debtor and his wife as makers, on December 14, 1983, by which they promised to pay Skemp $130,906.32, with interest, by October 1, 1984. Payments were to be made in monthly installments of $10,000.00 each, together with a $50,000.00 payment to be made by July 1, 1984 from the proceeds of the sale of the Michels' house. The note was secured by a third mortgage on the debtor's home and a second mortgage on a parcel of real estate held for investment. No payments were made and, as noted above, debtor and his wife, filed their bankruptcy petition on March 5, 1984.

10. Michel's trading was carried on in three accounts with his broker, McDonald & Co. The principal account was in Michel's name; two others, used in 1982 and into which a portion of Skemp's funds only

---

1. Although no account seems to have been taken of it in the parties' later dealings, the evidence indicates that Michel immediately gave back $5,000.00 of this sum to Skemp, to "show good faith" and to compensate Skemp for penalties paid for the early redemption of certificates of deposit which were the source of his payments over to Michel.

were deposited, were in the names of Alice Finley and Thomas Shatzer.[2]

11. Michel's personal account with his stock broker showed a net equity of $149,958.58 on November 26, 1982; by the end of February, 1983, that figure had dropped over $100,000.00, to $46,575.39; and by July 29, 1983, the account had a negative balance of $307.94.

12. All of Michel's stock market dealings in 1982 and 1983 resulted in a net loss of $75,121.02. No explanation is available as to the whereabouts of the balance of Skemp's money, except that in that period of time, Michel also paid, by his own admission, some $56,000.00 in personal obligations and $71,000.00 in bank loans. Michel attributes his losses to general market conditions and to the forced early sale of at least one profitable stock as a result of pressure from Skemp; Skemp, on the other hand, insists that this debacle is the result of Michel's use of the money he obtained from Skemp to maintain an opulent life style, featuring such items as Rolex watches for Michel and his wife and a Cadillac automobile. Michel does not deny making personal use of some of the withdrawals from his account with his broker to repay other loans, make mortgage and tuition payments and to pay off some relatively small obligations, and while denying that any of Skemp's funds were used for personal expenditures, the debtor also indicates that all of the funds in his account with his broker were Skemp's, except for approximately $8,000.00 which Michel had on deposit at the outset of this relationship.

13. Michel, by way of explanation of his sources of funds, apart from those obtained from Skemp, presents evidence of other borrowings totalling at least $67,000.00. Also, he claims to have had at his disposal some $40,000.00 from his sale of an investment property, certain loans totalling $30,000.00 were repaid to him by his realty company and his wife had income

over the period under examination of $11,500.00.

## II

## DISCUSSION

It is well to keep in mind, as we examine the welter of evidence submitted, the relatively narrow issues that remain for determination: First, did Michel obtain money from Skemp by "false pretenses, a false representation, or actual fraud ..." (11 U.S.C. § 523(a)(2)(A)); or second, has Skemp shown that Michel has committed "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" (11 U.S.C. § 523(a)(4))?

### A

An appropriate analysis of whether a debtor is shown to have been in violation of section 523(a)(2) would seem to proceed upon the following course:

■ First, it is recognized that section 523 of the Bankruptcy Code makes no significant changes in section 17 of the Bankruptcy Act of 1898. H.R.Rep. No. 595, 95th Cong., 1st Sess. 364 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 78 (1978) U.S. Code Cong. & Admin.News 1978, p. 5787.

A commentator, referring to section 17a(2), noted that the provision

... contemplates actual fraud that bankrupt knowingly made false representations, that such representations were made with the intent of defrauding the creditor or were made with such reckless disregard of the truth as to be tantamount to a willful misrepresentation, and that the creditor relied upon and was mislead by the false pretense or representation.

8 *Remington on Bankruptcy* § 3327.1 at p. 93 (Supp.1978).

Referring to the Code provision, the leading treatise states:

---

**2.** Michel's explanation of his use, with permission, he claimed, of these individuals' accounts is obtuse, to say the least. Each had a loss from previous years and Michel proposed to use that loss to offset any gains realized from his subsequent trading. It is perhaps fortuitous, from Michel's standpoint, considering the probable reaction of the Internal Revenue Service to such a scheme that the occasion to implement it did not arise!

Not all frauds are included within the exception of section 523(a)(2)(A), but only those which are involved in the obtaining of money, property or services by "false pretenses or false representations." ... The frauds included in the portion of section 523(a)(2)(A) under discussion are those which in fact involves [sic] moral turpitude or intentional wrong; fraud implied in law which may exist without imputation of bad faith or immorality, is insufficient. It must further affirmatively appear that such representations were knowingly and fraudulently made, and that they were relied upon by the other party. ... If the property (or services) was obtained prior to the making of any false representation, subsequent misrepresentations will have no effect upon the discharge of the debt.

3 *Collier on Bankruptcy,* para. 523.08 at pp. 43–49 (15th ed. 1985). (Footnotes omitted) [hereinafter cited as *Collier*] In footnote 11 appearing on page 523–43, *Collier* states: "Cases construing section 17a(2) of the Bankruptcy Act of 1898 are applicable to dischargeability issues presented under section 523(a)(2)(A) of the Code. *Fournet v. Miller, (In re Miller)*, 5 B.R. 424, 2 C.B.C.2d 845 (Bankr.W.D.La.1980)."

The burden of proof is upon the plaintiff, by at least a clear and convincing margin. *See e.g., In re Vissers,* 21 B.R. 638, 639 (Bankr.E.D.Wis.1982); *In re Toleikis,* 19 B.R. 944, 946 (Bankr.E.D.Mich.1982); *In re Robertos, Inc.,* 18 B.R. 551, 554 (Bankr.S. D.Fla.1982); *In re Dawson,* 16 B.R. 70, 73 (Bankr.E.D.Va.1981); *In re Ashley,* 5 B.R. 262, 266, 6 B.C.D. 655, 657, 2 C.B.C.2d 949, 955 (Bankr.E.D.Tenn.1980).[3]

Added to the objecting creditor's burden is the injunction that section 523 is to be "strictly construed against the objecting creditor and liberally in favor of the debtor. Any other construction would be inconsistent with the liberal spirit that has alwasy pervaded the entire bankruptcy system." 3 *Collier, supra,* para. 523.05A. This lib-

erality has been expressed by the Supreme Court as follows:

This court on numerous occasions has stated that "[o]ne of the primary purposes of the bankruptcy act" is to give debtor "a new opportunity in life and clear future effort, unhampered by the pressure and discouragement of pre-existing debt."

*Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed.2d 1230 (1934). Against this backdrop, the objecting creditor must proceed to prove at least five elements:

(1) That the debtor made representations;

(2) that at the time he knew were false;

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relied upon such representation; and

(5) that the creditor sustained a loss as the proximate result of the representations made.

*In re Houtman,* 568 F.2d 651, 655 (9th Cir.1978).

Assuming, *arguendo,* that all other elements are established by the requisite margin of proof necessary, the reliance of the creditor must have been reasonable. House Report, *supra,* at 364; *In re Geyen,* 11 B.R. 70, 71, 4 C.B.C.2d 623, 625, (Bankr. W.D.La.1981). It is true, of course, that the phrase "reasonably relied" appears in the Code section relating to false statements in writing, not a factor here. Nevertheless, common sense will not permit any other construction of the "reliance" which a creditor must show; to require less would produce an absurd result.

■ Here, even if Skemp has shown that the debtor's representations concerning the stock market investment scheme he was advocating were knowingly false and made to deceive him, he certainly has fallen short of showing the reasonableness of his re-

---

**3.** Such was the standard required under section 17a of the Bankruptcy Act of 1898. 3 *Collier, supra,* para. 523.08[5]. At least one other court has suggested that something more is required under the Code, i.e., that the evidence establish-

ing an allegation of fraud had to be "clear, *cogent* and convincing." *In re Ashley,* 5 B.R. 262, 266, 6 B.C.D. 655, 657, 2 C.B.C.2d 949, 955 (Bankr.E.D.Tenn.1980). (Emphasis added)

liance on them. To summarize the evidence on this point briefly, Michel came to Skemp via an introduction by Skemp's friend who had made real estate investments with and through Michel; and, although some such investments did occur for Skemp, about which he does not seriously complain, he was plainly and admittedly impressed with Michel's self-confessed prowess as a player of the stock market. So much so, in fact, that he eventually handed over $170,000.00 to Michel with no more of an investigation of this man who had been a stranger to him a few days before than to drive by Michel's home which turned out to be at least of the value Michel claimed for it! Skemp's desperation to avoid taxes led him to hastily and, as events ultimately proved, foolishly, place a substantial sum of cash with an individual whom the evidence shows to have been, to say the least, an inept securities trader.

■ Skemp's lack of reasonableness in his reliance is only slightly more glaring than is his failure to show, again by clear and convincing evidence, that Michel's representations with respect to his "plan" for investing were false. He did, in fact, make substantial investments in the stock market, a volatile arena at best, and, with many others, lost money, the bulk of which, sadly, was Skemp's. Whether Michel's inability to account for Skemp's funds has an impact upon the dischargeability of his debt to Skemp under section 523(a)(4) we shall examine next, but it is clear that Skemp has not proven that Michel had originally obtained the money by false pretenses or false representations.

### B

■ Next to be considered are the elements of section 523(a)(4) which, if found applicable, will result in a declaration of nondischargeability if the debtor has been guilty of "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;". As to the first portion of that provision, relating to acts done while in a "fiduciary capacity," the task is relatively simple. Citing the Supreme Court in *Davis v. Acceptance Co.*, 293 U.S. 328, 55 S.Ct.

151, 79 L.Ed. 393 (1934), the Sixth Circuit Court of Appeals has very recently ruled in *In re Interstate Agency, Inc.*, 760 F.2d 121 (1985) that section 17a(4) of the Bankruptcy Act of 1898, which did not differ from the current section relative to fiduciaries, applied to express trusts but not to implied or constructive and resulting trusts arising by operation of law. 760 F.2d at 124. *See also In re Johnson*, 691 F.2d 249 (6th Cir. 1982).

State law will control whether a property status represents an express trust creating fiduciary relationships. *In re Interstate Agency, Inc., supra; Aquillino v. United States*, 363 U.S. 509, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960).

The fiduciary capacity exception to discharge is, as *Collier* indicates, one of longstanding:

> The qualification that the debtor be acting in a fiduciary capacity has consistently, since its appearance in the Act of 1841, been limited in its application to what may be described as technical or express trusts, and not to trusts *ex maleficio* that may be imposed because of the very act of wrongdoing out of which the contested debt arose. There is no reason to believe that section 523(a)(4) will be construed otherwise. Thus, unless there is some additional fact, section 523(a)(4), insofar as it relates to a debtor acting in a fiduciary capacity, does not apply to frauds of the agents, bailees, *brokers*, ... and other persons similarly situated.

3 *Collier, supra*, para. 523.14 at pp. 108–09. (Emphasis added) Furthermore:

> In order to bring the debt within this exception, the fiduciary relationship must have existed previous to or independent of the particular transaction from which the debt arises; and the debt should be due from the fiduciary in his capacity as fiduciary.

*Id.* at pp. 114–15.

Given the instruction that we are to determine whether an express trust relationship was actually in existence between these parties by reference to state law, the following distinction between a trust and a debt is pertinent:

Whether a trust or debt is created through the payment of money by one person to another depends upon the manifested intentions of the parties. If the intention is that the money shall be kept or used as a separate fund for the benefit of the payor or of a third person, a trust is created. But a debt and not a trust is created through the payment of money by one person to another if the parties intend that the person receiving the money shall have the unrestricted use thereof, being liable to pay similar amount with or without interest to the payor or to a third person. The intention of the parties will be ascertained by a consideration of their words and conduct in the light of the surrounding circumstances. . . .

Where a stockbroker receives money from a customer or from the sale of a customer's securities, he may be either a trustee or a debtor. If there is an express or implied agreement between him and the customer that he shall not use the money as his own but shall apply it in accordance with the customer's directions, or immediately remit it to him, the money is held in trust. On the other hand, it may be expressly or impliedly agreed that the broker may use the money as his own, in which case he is a debtor. . . .

53 O.Jur.2d *Trusts*, § 16 at pp. 412, 414; *see also Squire v. Oxenreiter*, 130 Ohio St. 475, 200 N.E. 503 (1936); *Norris v. Norris*, 57 N.E.2d 254 (Ohio App.1943).

By these standards, the evidence falls short of establishing that Michel was in any sort of fiduciary relationship with Skemp. The simple fact that Skemp turned his money over to Michel without restriction, beyond the understanding that he would receive one-third of any "profits" from the investment thereof and the utter absence of any proof of any additional restrictions compel the court to conclude that no trust relationship was created.

The Bankruptcy Code effected a significant change in the structure of the language of section 17a(4) of the previous Act. The provision formerly spoke of the nondis-chargeability of debts created by "fraud, embezzlement, . . . while acting . . . in any fidiciary capacity;". The Bankruptcy Code, however, sets "embezzlement" and "larceny" apart from acts committed in a fiduciary capacity, and compels a consideration of whether either of those acts have been committed by the debtor. Thus, regardless of the finding that Michel was not in a fiduciary relationship with Skemp, inquiry must be made as to whether he has embezzled or been guilty of larceny with respect to Skemp's moneys.

■ The consideration of "larceny" may be brief as there is no evidence of acts amounting to such a misdoing here. Larceny may be defined as the fraudulent and wrongful taking and carrying away of the property of another with intent to convert it to the taker's use without the consent of the owner and with intent permanently to deprive the owner of such property. 34 O.Jur.2d *Larceny*, § 2; *In re Shinew*, 33 B.R. 588, 592 (Bankr.W.D.Ohio 1983). Michel's acts clearly do not fall within this definition.

■ Embezzlement, on the other hand, is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come. *In re Shinew, supra.* To the extent that section 523(a)(4) applies to Michel's acts at all, the facts as developed at trial will only support a consideration of the existence of an act of embezzlement by Michel.

■ The next hurdle to be surmounted by the plaintiff is the demonstration, again by a clear and convincing margin, that the debtor's eventual misappropriation of the property was motivated by a fraudulent intent, this requirement having become a common thread linking the decisions which have previously addressed the issue. *In re Epperson*, 45 B.R. 708 (Bankr.E.D.Tenn. 1985); *In re James*, 42 B.R. 265 (Bankr.W. D.Ken.1984); *In re Kelly*, 35 B.R. 640 (Bankr.S.D.Fla.1983); *In re Storms*, 28 B.R. 761 (Bankr.E.D.N.C.1983); *In the Matter of Shuler*, 21 B.R. 643 (Bankr.D. Idaho 1982).

The bankruptcy court in *In re Sutton*, 39 B.R. 390 (Bankr.M.D.Tenn.1984) had before it a case in which a consignor delivered gasoline to a consignee, the latter to make weekly accountings for the funds received for the product delivered to him under the consignment agreement. The debtor-consignee eventually discovered that he did not have sufficient funds on hand in his bank account or the cash register to pay the consignor and after making one payment with a worthless check, closed his business. The consignor brought a complaint with allegations similar to that before us. Judge Paine noted as follows:

> While circumstantial evidence may be used to prove both fraudulent intent and the actual taking of the property, such evidence, in order to meet the clear and convincing standard, should establish more than merely the unexplained absence of funds entrusted to a debtor.

*Id.* at 395–96. In *United States v. Powell*, 413 F.2d 1037 (4th Cir.1969), the court affirmed a conviction for embezzlement of a postal employee for an unexplained shortage of stamps and envelopes. In addressing the defendant's argument that the government must prove both a criminal intent and a fraudulent appropriation of the money by the defendant, the court noted:

> Both the intent and the actual taking, however, may be proved by circumstantial evidence.... where, as here, the defendant alone has access to the property, a substantial shortage is disclosed, and no explanation of the shortage is tendered by the accused, the trier of fact may reasonably infer from the circumstances that the custodian of the property has embezzled the missing funds.

*Id.* at 1038 (citations omitted).

In *United States v. Walker*, 677 F.2d 1014, 1016 (4th Cir.1982) the court noted that "conversion may be inferred from sole access plus an unexplained shortage ...," but reversed the defendant's conviction because the district judge, in his instructions, removed the factual issue of the existence of sole access from the jury's consideration.

The facts here will support, in my opinion, a finding that Michel has indeed embezzled, as that term is used in section 523(a)(4), a substantial portion of the moneys Skemp turned over to him in that Michel alone had access to the funds in question, a substantial shortage exists and no explanation of that shortage has been tendered by Michel. *See United States v. Powell, supra; United States v. Walker, supra.* It is true that Michel's horrendous performance in his stock market trading is explained by him as having been as a result of the general performance of the economy and pressure from Skemp to sell at inopportune times, but he has only been able to demonstrate net market losses in the amount of $75,121.02. (Finding of Fact 12) Indeed, Michel offers evidence of other borrowings and the availability of funds from other sources to explain his payments, in the years in question, of significant personal obligations and his indulgence in expensive watches and automobiles. Nevertheless, the stark fact remains that of the $120,000.00, exclusive of interest, still unpaid to Skemp out of the total proceeds Skemp delivered to him and all of which Michel placed in his market accounts with his stock broker, none remains. Michel entered this relationship with Skemp with some $8,000.00 of his own money in his accounts; at the end of a relatively brief, highly active and terribly unsuccessful period of trading through those accounts, Michel can show losses, as noted, of $75,-121.02. After deducting Michel's beginning balance of $8,000.00, the remainder, or $63,121.02 is totally unaccounted for. To that extent, Michel must be considered to have embezzled Skemp's funds and that much of Michel's indebtedness to Skemp will be declared nondischargeable and judgment for that amount, together with interest at the rate of 10% per annum from the date hereof and costs taxed at $60.00 will be entered against Michel.

## MEMORANDUM AND AMENDED ORDER

Counsel for the defendant, Mark Edward Michel, has moved for the correction of the court's order entered in this case on Au-

gust 5, 1985. Upon examination of the language complained of, the court finds the defendant's motion to be well taken, but disagrees with the results suggested by the defendant.

As set forth on page 20 of its Memorandum of Decision, the court found that Michel can account for only $75,121.02 in stock market losses. Of that sum, $8,000.00 was his own. The difference, or $67,121.02, must be deducted from the $120,000.00 of the moneys of the plaintiff, Charles G. Skemp which remain unpaid. The balance, or $52,878.98, is the correct sum for which Michel is not entitled to a discharge in bankruptcy.

IT IS THEREFORE ORDERED that because the defendant, Mark Edward Michel, has been determined to have embezzled the sum of $52,878.98 of the funds of the plaintiff, Charles G. Skemp, said sum is declared to be nondischargeable pursuant to 11 U.S.C. § 523(a)(4), and judgment is hereby rendered in said amount together with interest thereon at the rate of 10% per annum from the fifth day of August, 1985.

IT IS FURTHER ORDERED that in all other respects, the order of this court entered in this cause on August 5, 1985, shall remain in full force and effect.