760 F.2d 121
 In re INTERSTATE AGENCY, INC., A Michigan Corporation, Debtor.
In re Arthur Hugh LILLY, Debtor.
CAPITOL INDEMNITY CORPORATION, Plaintiff-Appellant, Cross-Appellee,
v.
INTERSTATE AGENCY, INC., and Arthur Hugh Lilly, jointly
severally, Defendants-Appellees, Cross-Appellants.
 Nos. 83-1807, 83-1840.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 17, 1985.
Decided April 30, 1985.
 
 Jimm F. White (argued), Hill, Lewis, Adams, Goodrich, Tait, Birmingham, Mich., for plaintiff-appellant, cross-appellee.
 S.I. Rosenberg (argued), Muskegon, Mich., for defendants-appellees, cross-appellants.
 Before KENNEDY, MARTIN and WELLFORD, Circuit Judges.
 WELLFORD, Circuit Judge.
 
 
 1
 Plaintiff, Capitol Indemnity Corporation (Capitol), appeals the part of a district court order affirming a bankruptcy court's decision that the debt personally owed by co-bankrupt, Arthur Hugh Lilly (Lilly), is dischargeable under the Bankruptcy Act of 1898. Co-bankrupt appellee, Interstate Agency, Inc. (Interstate), has also attempted to cross-appeal the part of the district court order reversing the bankruptcy court and holding its joint debt liability to plaintiff Capitol was not dischargeable under the Act. Interstate's cross-appeal, however, was not timely filed and this court thus has no jurisdiction to entertain its claim.[1]
 
 
 2
 The dispute centers on the status and nature of the legal relationships that Capitol, a Wisconsin insurance corporation, established with Interstate, a Michigan insurance agency, and its president, Lilly, during the 1970's. Capitol and Interstate entered into an agency agreement in July 1971 whereby Interstate was vested with the authority to accept premiums for policies underwritten by Capitol. Paragraph 1 of the agreement provided, in pertinent part, as follows:
 
 
 3
 The Agent shall collect, receive and receipt for premiums on Insurance tendered by an Agent to and accepted by the Company; and to retain out of the premiums so collected, as sole and full compensation on business so placed with the Company, commissions at ... [a scheduled] rate....
 
 
 4
 It is understood that all premiums received by the Agent shall be held by him as trustee for the Company until delivered to it; and the privilege of retaining commissions shall not be construed as changing that relationship....
 
 
 5
 (Emphasis added).
 
 
 6
 Lilly signed for Interstate in his capacity as president of the corporation. The end of the contract contained a section entitled "Individual Guarantees of a Corporate Agency." It bound "the undersigned, individually" to joint and severable liability for any sum which Interstate as corporate agent "may become liable to pay under said Agreement." Lilly also signed this section individually guaranteeing the debt. He was then, and continued to be, a major stockholder, director and principal officer of Interstate.
 
 
 7
 Between 1972 and 1974, Interstate maintained a regular series of monthly payment premiums to Capitol. In January 1975, however, Interstate began splitting the installment payments, which delayed the payment of the premiums due Capitol. By fall of 1975, it became apparent that Interstate would not even be able to continue these split premium payments. On September 4, 1975 the parties executed an "Evidence of Indebtedness" reflecting the status of the account. This acknowledged that $117,043.30, which Interstate then owed for paid premiums received through August 1975, would be rescheduled for payment to Capitol over four quarterly installments with interest.
 
 
 8
 Interstate, however, failed to make the first quarterly installment payment due under the agreement. On December 10, 1975 a second "Evidence of Indebtedness" was drawn up, which effectively released Interstate from the first indebtedness on the condition that Capitol be paid $50,000 on or before December 25, 1975 and that Interstate make timely premium payment transfers on all current accounts. This second agreement also terminated the agency arrangement between the parties.
 
 
 9
 Interstate subsequently defaulted on this second agreement by failing to pay the $50,000 and by not remitting most of the current premium payments it received. A third agreement was subsequently executed, providing that Interstate pay $50,000 by April 25, 1976 to cover back premiums and make $20,000 payments each month until the debt was extinguished. Between April and December 1976, Interstate paid $65,000 and reduced this indebtedness to $56,089.29, but it also still owed $67,043.30 on the first evidence of indebtedness.
 
 
 10
 Capitol maintained that the total indebtedness ($123,132.59) was non-dischargeable, and Capitol also requested interest and attorney fees in addition. The bankruptcy court, however, reduced the indebtedness to $111,391.30 plus interest. The bankruptcy court held that the money owed by Interstate and Lilly personally as guarantor was dischargeable as an ordinary business debt in bankruptcy. The district court reversed the bankruptcy court but only as to Interstate, holding that Interstate was bound by a fiduciary duty under Michigan law to remit collected premiums to Capitol. Thus the indebtedness was non-dischargeable according to Section 17(a)(4) of the Bankruptcy Act of 1898, 11 U.S.C. Sec. 35(a)(4) repealed by the Bankruptcy Act of 1978; see 11 U.S.C. Sec. 523(a)(4). At the same time, the district court also assumed that the non-dischargeable status of a bankrupt corporate officer's personal debt could not be established unless the corporation is found to be his alter ego. Under Michigan law, this piercing of the corporate veil was determined not to be justified in the absence of proven fraudulent activity on the part of the corporate officer.
 
 
 11
 We REVERSE the district court's decision in part, and extend the non-dischargeable debt holding to Lilly as well as to Interstate.
 
 
 12
 Section 17(a)(4) of the old Bankruptcy Act provided:
 
 
 13
 A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as ... [those which] (4) were created by his fraud, embezzlement, misappropriation or defalcation while acting as an officer or in an fiduciary capacity.
 
 
 14
 The Supreme Court has interpreted this language to mean that Section 17(a)(4) applied to express trusts but not to implied trusts nor constructive and resulting trusts that arise by operation of law. Davis v. Acceptance Co., 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934). To establish the nondischargeability of Lilly's debt, therefore, there must be 1) an express trust status to the property at issue; 2) Lilly must have been acting in a fiduciary capacity; 3) Lilly must have breached this relationship by at least "defalcation" of funds.
 
 
 15
 The Supreme Court has given a guideline as to how courts should determine whether a property status represents an express trust creating fiduciary relationships under Section 17(a)(4): " 'state law controls in determining the nature of the legal interest.' " Aguillino v. United States, 363 U.S. 509, 512-13, 80 S.Ct. 1277, 1279-80, 4 L.Ed.2d 1365 (1960), citing Morgan v. Commissioner, 309 U.S. 78, 82, 60 S.Ct. 424, 426, 84 L.Ed. 1035 (1940).
 
 
 16
 Michigan law thus determines the nature of the property interest in question. And Section 1207(1), Michigan Insurance Code of 1956, Mich.Comp.Laws, Sec. 500.1207(1) [Mich.Stat.Ann Sec. 24.11207(1) (Callaghan 1970) ], clearly establishes an insurance agency relationship as an express trust fiduciary relationship. The Michigan statute, supra, provides as follows:
 
 
 17
 An agent shall be a fiduciary for all moneys received or held by him in his capacity as an agent. Failure by an agent in a timely manner to turn over the monies which he holds in a fiduciary capacity to the persons to whom they are owed is prima facie evidence of violation of the agent's fiduciary responsibility.
 
 
 18
 In construing this statute, Michigan case law has uniformly held that premium payments received by an insurance agency have the status of trust funds for the benefit of the insurance principal. Glerum v. Spencer, 251 Mich. 163, 231 N.W. 38 (1930); Citizens Mutual Automobile Insurance Company v. Gardner, 315 Mich. 689, 24 N.W.2d 410 (1946); Travelers Insurance Company v. Bishop, 298 Mich. 600, 299 N.W. 731 (1941). This court has also interpreted a very similar Michigan statute regarding the relationship of construction funds in the contractor-subcontractor relationship to establish a "trust" property status. Selby v. Ford Motor Company, 590 F.2d 642 (6th Cir.1979), and Parker v. Klochko Equipment Rental Co., Inc., 590 F.2d 649 (6th Cir.1979).
 
 
 19
 The district court followed the general line of analysis as outlined above in discovering the existence of a trust status for the premiums collected by Interstate. The district court held that Interstate possessed a fiduciary obligation regarding the funds owed Capitol. Without any citation of relevant case law, the court declined to hold the trust status applicable to Lilly personally.
 
 
 20
 It is clear, however, that a corporate officer is personally liable for the tortious injury committed by him regardless of a piercing of the corporate veil. In A & M Records, Inc. v. M.V.C. Distributing Corp., 574 F.2d 312 (6th Cir.1978), we faced a similar question in a case controlled by Michigan law. Citing Michigan case law, among other authorities, the A & M Records court wrote:
 
 
 21
 The district court declined to hold defendant Merry personally liable for the damages on the basis of the alter ego doctrine, finding that there was insufficient evidence to justify piercing the corporate veil. Plaintiffs, on the other hand, argue that the district court erred in failing to hold Merry personally liable for his tortious actions. We agree.
 
 
 22
 It is well established that a corporate officer or agent is personally liable for torts committed by him even though he was acting for the benefit of the corporation. See Davis H. Elliot Co., Inc. v. Caribbean Utilities Co. Ltd., 513 F.2d 1176, 1182 (6th Cir.1975); Allen v. Morris Building Co., 360 Mich. 214, 218, 103 N.W.2d 491, 493 (1960); Warren Tool Co. v. Stephenson, 11 Mich.App. 274, 300-01, 161 N.W.2d 133, 148 (1968); 3A Fletcher, Cyclopedia of the Law of Private Corporations Sec. 1135, at 202.203 (1975); Restatement (Second) of Agency Sec. 343 (1957).... We conclude that the district court erred in failing to hold defendant Merry personally liable for his wrongful conduct.
 
 
 23
 Id. at 314-15. (Emphasis added).
 
 
 24
 In the Michigan case of Warren Tool Company, supra, cited above, in A & M Records, supra, the court specifically stated:
 
 
 25
 Corporate officers are not excused from personal liability for the conversion of other people's property simply because the corporation benefits from the wrong and because the corporate officers realize no personal profits from their acts of conversion [citation omitted].
 
 
 26
 11 Mich.App. at 300-301, 161 N.W.2d 133.
 
 
 27
 It is undisputable that Lilly should be imputed with knowledge and participation in Interstate's breach of fiduciary duty to Capitol. His status as president, large shareholder, and personal signatory to the agency agreement as well as debt contracts stands as overwhelming evidence of his full knowledge and responsibility for the handling of Interstate's trust undertakings. Lilly has breached his fiduciary duty stemming from these separate obligations: 1) his status as president of Interstate; 2) his personal status as an insurance agent under the Michigan Code; and 3) his personal signing of the agency agreements. See In re Whitlock, 449 F.Supp. 1383, 1390 (W.D.Mo.1978) (case finding the debt liability of corporate insurance officer non-dischargeable due to express trust obligation created by state law as well as agency agreement); see also Matter of Banister, 737 F.2d 225, 229 (2d Cir.1984), and Carey Lumber Co. v. Bell, 615 F.2d 370, 376 (5th Cir.1980).
 
 
 28
 "Defalcation" is defined as encompassing embezzlement, the "misappropriation of trust funds held in any fiduciary capacity,"[2] and the "failure to properly account for such funds." Since both Lilly and Interstate clearly failed to account properly for such funds, both are guilty of defalcation under Section 17 (a)(4). Such wrong-doing under Section 17(a)(4) does not have to be intentional. See, e.g., Carey Lumber Company v. Bell, 615 F.2d 370 (5th Cir.1980) ("misappropriation" under Section 17(a)(4) does not have to constitute intentional wrongdoing).
 
 
 29
 The three necessary elements for establishing non-dischargeable status under Section 17(a)(4) of the Bankruptcy Code are present in the case of Lilly's debt to Capitol: 1) the property at issue possessed an express trust status; 2) Lilly was personally acting in a fiduciary capacity; and 3) Lilly was personally responsible for the defalcation of the funds in the trust.
 
 
 30
 Accordingly, we REVERSE the district court's decision as to Lilly, because we hold that his debt to Capitol is also not dischargeable.
 
 
 31
 The case is REMANDED for further proceedings consistent with this opinion.
 
 
 
 [1]
 Rule 4 of the Federal Rules of Appellate Procedure (FRAP) allowed Interstate fourteen (14) days after Capitol filed an appeal on November 21, 1983. The fourteenth day was December 5, 1983. See FRAP 26(a) (computation of time). Interstate did not file until December 6. No extra "grace" period applies to this filing of a cross appeal. Welsh v. Elevating Boats, 698 F.2d 230 (5th Cir.1983)
 
 
 [2]
 BLACK'S LAW DICTIONARY, 375 (5th ed. 1979)