In re William J. McLAREN, Debtor,

Mohamed A. ATASSI, etc., et al, Plaintiffs,

v.

William J. McLAREN, Defendant.

Bankruptcy No. B88–04828.
Adv. No. B89–0087.

United States Bankruptcy Court, N.D. Ohio.

Jan. 26, 1990.

Harvey M. Gurley, Painesville, Ohio, and Harvey S. Morrison, Cleveland, Ohio, for plaintiffs.

Robert W. McIntyre, and Thomas C. Pavlik, Cleveland, Ohio, for defendant, debtor.

OPINION

DAVID F. SNOW, Bankruptcy Judge.

Plaintiffs filed this adversary proceeding to determine the dischargeability under section 523 of the Bankruptcy Code of the Debtor's obligation to pay to the Mohamed A. Atassi, M.D., Inc. Pension Trust Fund (the "Atassi Trust") $100,000 together with interest at 12 percent per annum and to pay to Dr. Mohamed A. Atassi a fee of $15,000 less the interest due to the Atassi Trust. These obligations are evidenced by a Time or Demand Note dated May 11, 1987 (the "Note") made by Plaza West, Ltd., a limited partnership ("Plaza West"), and guaranteed by the Debtor. The $100,-000 paid by the Atassi Trust to Plaza West pursuant to the Note was ostensibly intended to facilitate the refinancing of a strip

shopping center in Columbus, Ohio owned by Plaza West. No payment has ever been made on the Note.

The Debtor, William J. McLaren, is an investment adviser, an investor and a stockbroker; he filed his voluntary petition for relief under chapter 11 of the Bankruptcy Code on December 22, 1988. He was also the managing general partner of Plaza West.

Mohamed A. Atassi, one of the plaintiffs, is a cardiologist whose principal office is in Willoughby, Ohio. He also has offices in Painesville and Chardon, Ohio. In the last several years his practice has expanded to include two other doctors as junior partners. Dr. Atassi practices through a professional corporation named Mohamed A. Atassi, M.D., Inc. (the "Atassi Corporation"), which together with the Atassi Trust and Dr. Atassi comprise the three plaintiffs in this proceeding.

This matter was tried on September 19, 1989. The plaintiffs called a number of witnesses including Dr. Atassi; the Debtor called no witnesses. It is plaintiffs' contention that the $100,000 transfer evidenced by the Note was induced by Mr. McLaren's fraudulent misrepresentations and that Mr. McLaren's obligations under the Note are nondischargeable under sections 523(a)(2)(A) and (B) and 523(a)(4) of the Bankruptcy Code. In the course of the trial as well as in the pretrial discovery process, a number of ancillary issues were raised. These issues are discussed subsequently. Based on the evidence introduced at the trial we conclude that Mr. McLaren's obligations under the Note are nondischargeable under section 523(a)(2)(A) of the Bankruptcy Code.

This Court has jurisdiction in this adversary proceeding under 28 U.S.C. § 1334(b) and General Order No. 84 entered in this district on July 16, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

## Background

Dr. Atassi, a native Syrian, was a fellow at the Cleveland Clinic Foundation in 1967 prior to returning to Syria to practice medicine on the staff of the University of Damascus. He emigrated to the United States in 1972 and became a citizen in 1978. He is the principal of Atassi Corporation and the principal officer, beneficiary and trustee of the Atassi Trust.

Dr. Atassi first met Mr. McLaren in 1982. Mr. McLaren had been recommended to him as a financial adviser by another doctor. Mr. McLaren's credentials appeared impeccable; he worked for McDonald & Company, a prominent Cleveland investment firm which had been founded by Mr. McLaren's father. Over the next few years Mr. McLaren handled about five or six investment transactions for the Atassi group—one for Dr. Atassi personally in 1982 and the rest for the Atassi Trust. In 1986 Dr. Atassi made the first of several other personal investments in McLaren ventures. Typically these were structured as short-term loans for which Dr. Atassi was paid a substantial fee. Despite this, and the fact that all loans were ultimately repaid, Dr. Atassi became dissatisfied with these personal loans to Mr. McLaren because of payment delays and difficulties including several bounced checks.

The transaction which is the subject of this proceeding was initiated by Mr. McLaren in April, 1987. At that time he contacted Dr. Atassi with the proposal that Dr. Atassi loan $100,000 to Plaza West to enable it to refinance its shopping center. Mr. McLaren told Dr. Atassi that the $100,000 was required to be deposited with the lender which had agreed to make a $1,450,000 refinancing loan and that the Atassi loan would be repaid promptly from the proceeds of the refinancing. In fact, Mr. McLaren was at that time attempting to secure a refinancing loan from Ohio Financial Service Corporation ("Ohio Financial"), a mortgage company located near Columbus. The refinancing with Ohio Financial had been initiated by Reginald Brooks, the president of Madison Mortgage Company ("Madison"), a mortgage broker located in Cleveland. Mr. Brooks was an acquaintance of Mr. McLaren and had been com-

missioned by Mr. McLaren to arrange financing for the Plaza West center and two other strip shopping centers in the Columbus area in which Mr. McLaren had an interest. Kenneth G. Zimpfer, executive vice president of Ohio Financial, was in charge of the refinancing and was in contact with Mr. Brooks and later with Mr. McLaren.

Based upon his preliminary evaluation, Mr. Zimpfer had expressed sufficient interest in the refinancing to send Mr. Brooks a letter dated April 30, 1987 inviting a formal loan application. This letter, which plays a pivotal role in this case, required $15,000 to be deposited with Ohio Financial by May 8, 1987, for Ohio Financial to act on the loan application.

The $15,000 was deposited with Ohio Financial but the refinancing never occurred. In July 1987, the refinancing loans were turned down by Ohio Financial because of the borrower's unsatisfactory credit history. Messrs. Brooks, McLaren and Zimpfer met in Columbus to discuss the situation. Based upon that meeting Ohio Financial offered to refinance on more stringent terms; Mr. Brooks rejected this proposal on behalf of Mr. McLaren. In August 1987 Ohio Financial returned to Mr. McLaren $5,005, the unused balance of his original $15,000 loan application deposit.

Back in April and May 1987, however, Mr. McLaren was pressing Dr. Atassi for $100,000 which he said was required to be deposited with Ohio Financial to secure the Plaza West refinancing. When Dr. Atassi told Mr. McLaren that he didn't have the money, Mr. McLaren suggested use of Atassi Trust assets. As a further inducement, he promised Dr. Atassi a $15,000 fee. Dr. Atassi expressed concern with whether the loan was proper for the Atassi Trust as well as with the propriety of his receiving a fee for the Trust's making the loan. Mr. McLaren assured him that it was all perfectly legal, that it was done all the time; he repeated these assurances to Mrs. Ross, Dr. Atassi's office manager, on May 11, 1987, when he brought the Note evidencing the Loan to Dr. Atassi's office for execution.

Dr. Atassi made no separate investigation of these matters. After the loan had gone sour, however, Dr. Atassi was advised that the loan was probably a prohibited transaction for the Atassi Trust under applicable tax laws and jeopardized the tax status of the Trust. He was also advised that the arrangement violated his fiduciary duty as trustee of the Atassi Trust. Based on that advice he subsequently repaid the Atassi Trust the $100,000 loaned to Plaza West as well as $5,000 in accrued interest or penalty in an attempt to rectify the situation.

Dr. Atassi expressed another concern with the loan. He had had payment difficulties with prior personal loans to Mr. McLaren and insisted that the Atassi Trust loan be made only to a *bona fide* third party. He requested evidence to substantiate that the $100,000 was a third party transaction and not a personal loan to Mr. McLaren. Mr. McLaren provided that assurance by hand delivering to Dr. Atassi a copy of the April 30, 1987 letter from Mr. Zimpfer of Ohio Financial with one crucial alteration; the deposit required for the applications had been raised from $15,000 to $100,000. Much of the trial was devoted to the plaintiffs' attempt to prove that Mr. McLaren was responsible for this alteration. The evidence is persuasive that this alteration was effected by Mr. McLaren in order to persuade Dr. Atassi that Ohio Financial required $100,000, not $15,000, in order to proceed with the Plaza West refinancing.

On May 11, 1987 Mr. McLaren came to Dr. Atassi's office with the Note to press Dr. Atassi to make the $100,000 loan. Mr. McLaren assured Dr. Atassi that Ohio Financial had given him a grace period beyond May 8 to make the required deposit but that the deposit must be made immediately. He also assured Dr. Atassi that the repayment of the loan would be made from proceeds of the refinancing and that Ohio Financial had approved the refinancing. This assurance was set forth in the Note. In fact, however, the refinancing had not been approved by Ohio Financial and was never approved by Ohio Financial.

The $100,000 loan was disbursed in three installments—the first by a $40,000 check payable to Plaza West. This check was endorsed by Mr. McLaren on behalf of Plaza West and deposited on May 12, 1987 in account number 40855–1108 with Ameri-Trust Company. This account was in the name of 8916 Perkins Corporation, a corporation wholly owned by Mr. McLaren of which he was the sole officer and director. The other $60,000 was paid at Mr. McLaren's direction by wire transfer in two installments from the Atassi Trust securities account to the same corporate account with AmeriTrust. No payments were made directly from this account to Plaza West, Madison Mortgage or Ohio Financial. There is no evidence to suggest that any part of the $100,000 Atassi Trust loan was paid indirectly to any of these entities. We find that Mr. McLaren, without the plaintiffs' knowledge or consent, intentionally appropriated the $100,000 for his own use without regard to any business of Plaza West.

### Discussion

Plaintiffs argue that under these facts Mr. McLaren's debt under the Note is non-dischargeable under the following provisions of section 523(a)(2)(A) and (B) and (a)(4):

*Exceptions to discharge.*

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; or

. . . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;. . . .

■ Our analysis and conclusion are premised on the generally accepted proposition that exceptions to a debtor's discharge are to be strictly construed against the creditor. The debtor's right to the fresh start promised by the bankruptcy laws requires that any doubts as to the applicability of the 523 exceptions be resolved in the debtor's favor. *See Schwalbe v. Gans (In re Gans)*, 75 B.R. 474 (Bankr.S.D.N.Y. 1987).

It is established that in order to except a debt from discharge under § 523(a)(2)(A) the creditor must prove that the debtor obtained money through a material misrepresentation that at the time the debtor knew was false or made with gross recklessness as to its truth. The creditor must also prove the debtor's intent to deceive. Moreover, the creditor must prove that it reasonably relied on the false representation and that its reliance was the proximate cause of loss. *Coman v. Phillips (In re Phillips)*, 804 F.2d 930, 932 (6th Cir.1986). *Accord First Nat'l Bank of Red Bud v. Kimzey (In re Kimzey)*, 761 F.2d 421 (7th Cir.1985).

Plaintiff's evidence indicates that Dr. Atassi was induced to make the $100,000 loan evidenced by the Note by a series of misrepresentations which Mr. McLaren knew were false and which were made to induce payment of the $100,000 to Mr. McLaren. Mr. McLaren misrepresented the intended use of the $100,000, the amount required to be paid to Ohio Financial to induce it to make the refinancing loan to Plaza West, the status of the refinancing loan and, most flagrantly, Mr. McLaren raised the $15,000 deposit requirement in Ohio Financial's April 30 letter to $100,000.

The Debtor introduced no evidence to rebut the plaintiffs' case. Rather Debtor denigrates that case as circumstantial and argues that Dr. Atassi was a willing participant in a transaction motivated by his own greed and marked by his breach of trust. Debtor's principal argument, however, is that the plaintiffs failed to prove their case by "clear and convincing" evidence, as required by the many cases which have considered section 523(a)(2). *Manufacturer's Hanover Trust Company v. Ward (In re Ward)*, 857 F.2d 1082 (6th Cir.1988); *In re Phillips, supra; Knoxville Teachers Credit Union v. Parkey (In re Parkey)*, 790 F.2d 490 (6th Cir.1986); *Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163 (6th Cir.1985). We concur that plaintiffs did in fact have the burden of proving their case by clear and convincing evidence. Clear and convincing evidence has been defined in this Circuit as

> that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of reasonable doubt as in criminal cases. It does not mean clear and unequivocal.

*Hobson v. Eaton*, 399 F.2d 781, 784 n. 2 (6th Cir.1968) *cert. denied*, 394 U.S. 928, 89 S.Ct. 1189, 22 L.Ed.2d 459 (1969) (quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954)).

There is no objective scale by which to measure the quanta of proof which separate a preponderance of evidence from evidence that is clear and convincing or evidence that establishes a fact beyond a reasonable doubt. But on a scale that ranges between a finding that it is only somewhat more probable than not to absolute certainty, the plaintiffs' proof leaves us very comfortably near the high end as to each of the elements plaintiffs were required to prove to establish nondischargeability under section 523(a)(2)(A).

The evidence was overwhelming that Mr. McLaren misrepresented the nature and status of the Plaza West refinancing. The raising of the $15,000 figure in the April 30 letter from Ohio Financial to $100,000 is only the most flagrant and damning element of these misrepresentations. Plaintiffs established a chain which linked the original April 30 letter requiring a $15,000 deposit from its author, Mr. Zimpfer, to Mr. Brooks, from Mr. Brooks to the Debtor and from the Debtor to Dr. Atassi. They established by persuasive testimony that the April 30 letter delivered by Mr. Brooks to Mr. McLaren continued to show the deposit as $15,000 but that the $15,000 had been raised to $100,000 in the copy of that letter delivered by Mr. McLaren to Dr. Atassi. They also showed that the $100,000 alteration had been produced by a typeface different from that used in the original April 30 letter and the typewriters in Dr. Atassi's offices but the same as that used in other letters from Mr. McLaren to Dr. Atassi. Debtor's only response was to make clear on cross-examination that the typeface used for the $100,000 alteration could not be traced to any specific typewriter, that the typeface was very common and that the possibility that such a typeface had existed in one of Dr. Atassi's offices could not be ruled out. But Debtor did not dispute the crucial fact that the $100,000 figure was made in a typeface different from the typeface used in the remainder of the April 30 letter or discredit plaintiffs' evidence that the change from $15,000 to $100,000 was made after Mr. Brooks delivered the letter to Mr. McLaren and prior to Mr. McLaren's delivery of the letter to Dr. Atassi.

To meet their burden of proving this element of their case by clear and convincing evidence, plaintiffs were not required to produce an eye witness to the alteration of the letter. It seems likely that the only eye witness would have been Mr. McLaren and he chose not to testify to deny plaintiffs' allegations. Plaintiffs' evidence, taken as a whole, leads inescapably to the conclusion that Mr. McLaren altered the April 30 letter as part of a scheme to obtain the $100,000 from Dr. Atassi for his personal use on the pretext that the $100,000 was required for the Plaza West refinancing. If there is an innocent explanation, it eludes us, and Mr. McLaren has chosen not

to provide it. *See Carini v. Matera (In re Matera)*, 592 F.2d 378 (7th Cir.1979).

Mr. McLaren's alteration of the April 30 letter is also graphic and convincing evidence of the intent to deceive required by *Phillips*. Dr. Atassi had requested assurance that the loan was to be made to a third party, not to Mr. McLaren. In response the Debtor produced the altered version of the April 30 letter. No reason was suggested and none occurs to us for the alteration of the April 30 letter other than Mr. McLaren's belief that he needed to show Dr. Atassi written evidence that the $100,000 was required by Plaza West to effect the Ohio Financial refinancing.

This scheme was also promoted by the Debtor's misrepresentation that the refinancing had been approved by Ohio Financial, made both orally to Dr. Atassi and in the Note. In fact, the refinancing had not been approved. Since the refinancing had reached the application stage, Mr. McLaren may have expected and believed that it would be approved; but the evidence suggests no basis to conclude that he believed that it had been approved. It is also clear that plaintiffs' reliance on Mr. McLaren's misrepresentations was justified and was the proximate cause of plaintiffs' loss.

Dr. Atassi was required to prove that he relied upon Mr. McLaren's misrepresentations and that his reliance was reasonable. *In re Phillips, supra.* The evidence is clear that Dr. Atassi insisted upon a *bona fide* third party transaction, not a personal loan to Mr. McLaren. This fact, and Mr. McLaren's recognition of this fact, is evidenced by his alteration of the April 30 letter. Dr. Atassi testified that he relied upon and believed Mr. McLaren's assurances. There is nothing in the record to suggest otherwise.

The Debtor attempted, however, to denigrate the reasonableness of this reliance by suggesting that Dr. Atassi was a willing, even eager, participant in a fast buck deal in which Dr. Atassi sought personal profit at the expense of his duties to the Atassi Trust. Whether or not Dr. Atassi was motivated by the prospect of the $15,000 fee does not affect the reasonableness of

his reliance on Mr. McLaren's assurances concerning the Plaza West refinancing or concerning the propriety of the arrangement Mr. McLaren proposed. But the evidence shows that his reliance on Mr. McLaren's assurances relating to the Atassi Trust was reasonable.

Dr. Atassi expressed concern both with use of Atassi Trust assets and his receipt of a personal fee. Mr. McLaren assured him that the arrangement was not only legal but was in fact quite ordinary. He repeated these assurances to Mrs. Ross, Dr. Atassi's office manager. Although it turned out that these assurances were wrong, and apparently part of Mr. McLaren's scheme to obtain the $100,000 by whatever means, no reason is suggested why Dr. Atassi should not have relied upon Mr. McLaren's assurances.

Mr. McLaren had been a trusted investment adviser for six years. Although his repayment of personal loans had been problematic, there had been no question of the propriety of his investments on behalf of the Atassi Trust. Dr. Atassi was pressed to conclude the deal under the phony deadline of making the refinancing deposit to Ohio Financial at a time when he was busy and away at a professional meeting. Mr. McLaren was an experienced broker and investor. He can and should have known whether the deal he proposed to Dr. Atassi and the Atassi Trust was customary and legal. Dr. Atassi, on the other hand, is an immigrant to this country, as is apparent from his speech. Whatever his medical sophistication, there is nothing in the record to suggest a legal or business sophistication that should have raised doubts as to Mr. McLaren's assurances. In view of McLaren's professional qualifications and their relationship, it was reasonable for Dr. Atassi to rely on these assurances.

When coupled with the unrebutted evidence that the proceeds of the $100,000 loan were not in fact required by Ohio Financial and were not paid to it or to Plaza West but were immediately paid into Mr. McLaren's personal holding company bank account, the conclusion is inescapable not only that Mr. McLaren knowingly mis-

represented the nature and status of the Plaza West refinancing, but employed it as a pretext to obtain the personal loan that he knew Dr. Atassi would not make to him.

It is also clear that Dr. Atassi's reliance on Mr. McLaren's representations was the proximate cause of his loss within the meaning of the *Phillips* case. From one perspective plaintiffs' loss is the result of the insolvency and bankruptcy not only of Mr. McLaren but also of Plaza West. However, had Mr. McLaren truthfully described the Plaza West refinancing and the real nature of the $100,000 loan, McLaren certainly believed, and the evidence persuades us that he was correct in the belief, that the loan would not have been made and the $100,000 would not have been lost. Therefore Mr. McLaren's misrepresentations can properly be viewed as the proximate cause of the plaintiffs' loss.

■ The Debtor also sought to avoid responsibility for the loss by attempting to portray Dr. Atassi as a usurer in agreeing to receive the $15,000 fee. However, despite the Court's request that the issue be briefed, Debtor presented no authority for the proposition that the $15,000 fee promised Dr. Atassi was illegal or usurious other than citing sections 1343.05[1] and 2905.-21 of the Ohio Revised Code in his pretrial brief. On their face these charges appear gratuitous and irrelevant since the fee was both structured by Mr. McLaren and presented to Dr. Atassi as legal and ordinary. Debtor's failure to respond to the court's request for authorities suggests that they were not asserted seriously. Our review of the question strengthens this impression.

On their face neither section 2905.21 nor 1343.01 necessarily applies to the $15,000 fee since it is not clear that the fee promised Dr. Atassi constituted interest. It is referred to in the Note as a fee, not as interest. The fact that Dr. Atassi characterized it as interest in his testimony is not germane since this is strictly a legal issue.

But even if the fee were deemed interest, it does not appear to violate the Ohio laws referred to by the Debtor.

Sections 2905.21 through 2905.24 of the Ohio Revised Code proscribe the extortionate extension of credit and engaging in criminal usury. The operative section is 2905.22. It provides:

No person shall:

(A) Knowingly make or participate in an extortionate extension of credit;

(B) Knowingly engage in criminal usury; . . .

(D) Whoever violates division (A) or (B) of this section is guilty of a felony of the third degree. . . .

Section 2905.21 cited by Debtor defines "extortionate extension of credit" and "criminal usury" as used in section 2905.22.

The extortionate extension of credit involves the use or threat of violence and is obviously irrelevant. Section 2905.21(H) defines criminal usury as

[i]llegally charging, taking or receiving any money or other property as interest on an extension of credit at a rate exceeding twenty-five per cent per annum or the equivalent rate for a longer or shorter period, unless either:

(1) The rate of interest is otherwise authorized by law;

(2) The creditor and the debtor, or all the creditors and all the debtors are members of the same immediate family.

Although the $15,000 fee would if considered to be interest translate to an interest rate in excess of 25 percent per annum, we found no authorities which suggest that there was anything illegal, let alone criminal, about the $15,000 fee. As noted below, that fee viewed as interest is exempt from the eight percent cap on interest rates imposed by Ohio Revised Code section 1343.01. There appears to be no other interest rate cap applicable to the $100,000 loan and therefore no basis to conclude that the $15,000 fee was illegal. Moreover, the fact that the loan falls within the excep-

---

**1.** It appears to the court that the Debtor intended to refer to O.R.C. § 1343.01 rather than § 1343.05. Section 1343.05 deals with endorsees of negotiable paper while section 1343.01 deals with the maximum interest rate allowable under Ohio law. Since nothing in the record indicates that section 1343.05 applies, we have not addressed it.

tions to the eight percent cap indicates that the $15,000 fee should be deemed to be otherwise authorized by law within the meaning of section 2905.21(H)(1).

Finally, section 2905.22 requires the accused to have *knowingly* engaged in criminal usury. The evidence is that Dr. Atassi believed that the $15,000 fee was legal. Since the Debtor structured the loan and assured Dr. Atassi that the $15,000 fee was legal and ordinary, it is apparent that the Debtor's appeal to section 2905.21 is not only without foundation but is a cynical attempt to escape liability by capitalizing on his own fraud. In short, we find no credible basis to support an argument that the plaintiffs were guilty of criminal usury.

Section 1343.01 of the Ohio Revised Code invalidates interest exceeding eight percent per annum with certain exceptions. Among these exceptions are loans in excess of $100,000, loans payable on demand or in one installment which are not secured by household goods, and business loans. This loan was for exactly $100,000 and probably does not come within the exception for loans in excess of $100,000. However, it appears clearly to fit into the exceptions for loans payable on demand or in one installment and business loans. In any event breach of section 1343.01 would not result in invalidation of the loan; it would result only in invalidation of the excessive interest. O.R.C. § 1343.04.

■ Debtor also seeks to avoid responsibility for his fraud by urging that Dr. Atassi's repayment of the loan to the Atassi Trust paid the Trust in full and discharged the Debtor's obligation. Here again, despite the court's request Debtor offered no authority for his argument, which on its face is too self-serving to be persuasive. Clearly Dr. Atassi is not a volunteer. He is the primary officer and beneficiary of the Atassi Trust. His repayment to the Atassi Trust was motivated by his practical and personal concern with possible penalties or loss of the Trust's tax exempt status. There was clearly no intention that Dr. Atassi's payment would absolve the Debtor from his obligations under the Note and no legal reason whatever why

Dr. Atassi shouldn't be subrogated to whatever rights the Atassi Trust has against the Debtor, with or without a formal assignment of the Note. *See* 18 O.Jur.3d *Contribution, Indemnity, and Subrogation,* § 2 (1980 & Supp.1989) and cases cited therein.

When this issue was raised at trial, Dr. Atassi signed a handwritten assignment from the Atassi Trust to Dr. Atassi individually. However else that assignment might be characterized, it made clear that there was no intent on the part of any of the plaintiffs that their transactions among themselves should release the Debtor from his obligation under the Note nor is there any legal or equitable reason why it should do so.

■ The Debtor also complained that the plaintiffs did not comply with the Court's order setting trial. Based on this failure, the Debtor filed a motion for judgment on the pleadings and a motion in limine to preclude the plaintiffs from introducing any document or calling witnesses at trial. Following the trial we requested the Debtor to submit any authority which would support Debtor's position with respect to these motions. The Debtor presented no such authorities. For the reasons discussed below, we conclude that these motions were properly denied.

Plaintiffs were in fact late in complying with the Court's trial order. According to plaintiffs' counsel they misread the Court's order and did not file their exhibits which were due September 1 until September 11. They also designated one witness and some additional exhibits on September 12 rather than on September 11, when the witness list was due.

The Court views any failure to comply with its orders as serious and admonished plaintiffs' counsel accordingly. However, it did not appear that the plaintiffs' failures in this regard had prejudiced the Debtor or burdened his preparation for or presentation of evidence at the trial. The Debtor at no point sought from the Court an adjournment because of surprise or prejudice. Debtor's rather disingenuous explanation for this omission was that plaintiffs had

refused Debtor's request for a continuance leaving Debtor no alternative but an order denying plaintiffs the right, in effect, to go forward with their case. Since the exhibits were quite limited and, for the most part, already familiar to Debtor, it was clear that Debtor was not in fact surprised and sought instead to use plaintiffs' tardiness to attempt to nonsuit the plaintiffs.

Since it appears that any failure by the plaintiffs in this regard was inadvertent and not designed to inconvenience either the Debtor or the Court, we concluded that the appropriate sanction was to admonish plaintiffs' counsel rather than to deny introduction of exhibits or the testimony of any witness. Under these circumstances the court has both the discretion and the duty to administer its trial orders so as to take into appropriate account such factors as surprise, prejudice and bad faith to avoid injustice to either party. *See Ashland Oil Inc. v. Arnett*, 875 F.2d 1271 (7th Cir.1989); *In re Delagrange*, 820 F.2d 229 (7th Cir.1987); *Smith v. Rowe*, 761 F.2d 360 (7th Cir.1985). Since there was no surprise, prejudice or bad faith, it would have been improper to suppress plaintiffs' evidence.

Plaintiffs also invoked sections 523(a)(2)(B) and 523(a)(4) to deny Debtor's discharge on the obligation reflected in the Note. However, plaintiffs cited no authorities which justify treating the revised April 30 letter or the Note as a statement in writing "respecting the debtor's or an insider's financial condition" under section 523(a)(2)(B). As to section 523(a)(4), it is not clear that the Debtor was acting in a fiduciary capacity to plaintiffs in respect of the $100,000 loan within the contemplation of that section.

The term "fiduciary" is not defined in the Bankruptcy Code. Most courts have construed the word narrowly, consistent with the strict interpretation of the section 523 exceptions to discharge, and have limited the application of section 523(a)(4) to cases involving an express trust. *See, e.g., Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *Capitol Indemnity Corp. v. Interstate Agency, Inc. (In re Interstate Agency, Inc.)*, 760 F.2d 121 (6th Cir.1985); *University Orthopaedic Ass'n of Rochester v. Catalano (In re Catalano)*, 98 B.R. 168 (Bankr.S.D.N.Y. 1989). Thus the courts have generally refused to apply section 523(a)(4) where, as here, the case involved a loan even though the lender had a fiduciary relationship with the borrower. *See In re Gans, supra.*

It is also unclear whether the Debtor's fraud amounted to embezzlement or larceny under section 523(a)(4). We need not reach this issue, however, since it is clear that the Debtor obtained the $100,000 by false pretenses amounting to actual fraud under section 523(a)(2)(A).

The parties tried the case on the assumption that the Debtor's liability was based on the terms of the Note. Apparently Plaza West had been liquidated without payment to plaintiffs prior to the trial. In any event no issue was raised as to Debtor's liability as guarantor of the Note.

Based on the foregoing we hold that the Debtor's liability to the plaintiffs under the Note is nondischargeable under section 523(a)(2)(A). The Court's order in accordance with this decision is attached.

## JUDGMENT

An opinion having been rendered by the Court in this adversary proceeding,

IT IS ORDERED, ADJUDGED and DECREED that

The Debtor's obligations to the plaintiffs evidenced by the Time or Demand Note, a copy of which is attached hereto and incorporated herein, be, and it hereby is, held to be nondischargeable pursuant to section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A).

EXHIBIT

## TIME OR DEMAND NOTE

**$100,000.00**                                                     **May 11th, 1987**

After the above date, for value received, Plaza West Ltd the undersigned jointly and severally promises to pay to the order of The Mohamed A Atassi MD Inc Pension Trust the principal sum of One Hundred Thousand Dollars, due and payable July 11th, 1987 in addition to interest at a rate of 12% per annum payable at maturity. Also, Dr Mohamed A Atassi, personally, shall be paid a fee in an amount equal to $15,000.00 less applicable interest due the Pension Trust at maturity.

This transaction is based upon the following conditions:

a) that Plaza West Ltd has recently received an MAI appraisal approximating $1,300,000.00 in conjunction with the proposed financing;

b) that Plaza West Ltd has a current first mortgage in the amount of $850,000.00;

c) that there are no 2nd mortgages outstanding on this property, nor will there be until the refinancing is completed and until this obligation is fulfilled;

d) that William J McLaren has represented to Dr Mohamed A Atassi that the refinancing has been approved and will be completed within 60 days of the date of this note;

e) that William J McLaren agrees, in the event that refinancing does not take place, to be personally and solely resposible for the repayment of this obligation;

f) that repayment shall be based solely upon the refinancing proceeds and not contingent on the operating results of the partnership.

In the event of non-payment of any principal or interest hereunder, when due, the entire balance of principal then remaining unpaid with accrued interest thereon, shall at once become due and payable at the option of the holder hereof, without notice or demand.

The maker and endorser hereby waives presentment, demand, notice of dishonor, protest and notice of nonpayment and protest.

Plaza West Ltd
William J McLaren, Gen Partner
(maker and endorser)

William J McLaren
(additional guarantor)

**EXHIBIT**
**A**

All of the endorsers hereof waive presentment, demand, notice of dishonor, protest, notice of protest and non-payment, agree and consent to any and all waivers, extensions and renewals which the holder may grant and agree and consent that any collateral for this note may be exchanged or surrendered by the holder in whole or in part from time to time and that the rate of interest may from time to time be changed, notice of any and all such waivers, extensions, renewals, changes, exchanges or surrenders being hereby waived. All of the endorsers hereof waive advertisement or other notice of the sale of any such collateral and agree that all of the provisions of this note shall apply to and bind the undersigned endorsers as though they were makers.

witness

WITNESS

KATHLEEN M. ROSS
Notary Public, State of Ohio
My Commission Expires April 12, 1989
(Recorded in Lake County)