**In re EAGLE–PICHER INDUSTRIES, INC., Debtor.**

**No. 1–91–00100.**

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

May 24, 2000.

Theodore V.H. Mayer, Andrea L. Hazzard, Hughes Hubbard & Red, New York City, for Eagle–Picher Industries, Inc. Personal Injury Settlement Trust.

Stephen Karotkin, Weil Gotshal & Manges, New York City.

Debra A. Dandeaneau, Weil Gotshal & Manges, Miami, FL.

David G. Krall, Eagle-Picher Industries, Inc., Cincinnati, OH.

Neal J. Weill, Justice Department, Cincinnati, OH, Asst. U.S. Trustee.

## DECISION ON MOTION
## OF PI TRUST

BURTON PERLMAN, Bankruptcy Judge.

The debtors in the caption of this case were Eagle–Picher Industries, Inc. and its wholly-owned subsidiaries. These debtors filed separate Chapter 11 bankruptcy cases in this court which were administered on a consolidated basis. The Third Amended Plan ("the Plan") was confirmed November 18, 1996. The Plan provided for the creation of the Eagle–Picher Industries, Inc. Personal Injury Settlement Trust (the "PI Trust"). The PI Trust was created by Trust Agreement effective November 29, 1996. The PI Trust assumed all liability and responsibility for asbestos personal injury claims, such claims having been the precipitating cause of the bankruptcy filings of debtors. The PI Trust also assumed liability for lead personal injury claims.

Now before the court is a motion by the PI Trust. In its motion, the PI Trust contends that the funds which will be distributed to it on the Final Distribution Date constitute the res of an express trust and should have been held in trust after the date the plan required commencement of the trust, November 29, 1996. The PI Trust asserts that it is entitled to interest on the trust res from that commencement date.

This motion is directed by the PI Trust to an entity identified as Eagle–Picher Holdings, Inc., a majority-owned subsidiary of Granaria Industries, B.V. (hereafter "Respondent.") This is so because the Plan provided that the PI Trust be the owner of the entire equity interest in the reorganized debtor, and the PI Trust sold that interest to Granaria. The acquired company thereby became a subsidiary of Respondent. The PI Trust says that Respondent has succeeded to the duties and obligations of the bankruptcy debtors. Respondent opposes the motion.

To resolve the controversy presented by the parties, we must look carefully at the pertinent language of the Plan, giving due attention to how the Plan is structured with regard to the PI Trust. We must look primarily to Article 10 of the Plan which we reproduce in its entirety:

## ARTICLE 10

## TRANSFERS OF PROPERTY TO AND ASSUMPTION OF CERTAIN LIABILITIES BY THE PI TRUST

### 10.1 Transfer of Certain Property to the PI Trust

10.1.1 *Transfer of Books and Records.* On the Effective Date or as soon thereafter as practicable, the Reorganized Debtors shall transfer and assign, or cause to be transferred and assigned, to the PI Trust the books and records of the Debtors that pertain directly to Asbestos Personal Injury Claims or Lead Personal Injury Claims that have been asserted against the Debtors (except, in the case of Lead Personal Injury Claims, to the extent that any such Lead Personal Injury Claims are the subject of an objection brought by any of the Debtors and which the Reorganized Debtors prosecute in accordance with section 5.1 hereof, in which case the books and records pertaining to such Lead Personal Injury Claims will be transferred to the PI Trust as soon as practicable after such objection has been resolved by a Final Order). The Plan Proponents will request that the Bankruptcy Court, in the Confirmation Order, rule that such transfer does not result in the destruction or waiver of any applicable privileges pertaining to such books and records. If the Bank-

ruptcy Court does not so rule, at the option of the Plan Proponents, the Reorganized Debtors will retain the books and records and enter into arrangements to permit the PI Trust to have access to such books and records.

10.1.2 *Transfer of Certain Insurance Rights.* Certain rights to insurance, to be agreed upon by the Plan Proponents (each in its sole discretion), also will be transferred to the PI Trust on the Effective Date.

10.1.3 *Transfer of Plan Consideration.* On the Initial Distribution Date, the Reorganized Debtors shall transfer and assign, or cause to be transferred and assigned, to the PI Trust all right, title, and interest in and to the Pro Rata Share with respect to the PI Trust Share of Distribution Value. Such Pro Rata Share shall be payable to the PI Trust in the following consideration: (i) first, the Tax Refund Notes; (ii) second, ten million (10,000,000) shares of New Eagle–Picher Common Stock, (iii) third, to the extent that the value of consideration paid under (i) and (ii) of this section 10.1.3 is less than such Pro Rata Share, the amount of Available Cash remaining after making all Distributions required to be made to the holders of Claims in Classes 19, 20, and 21 of the Plan on the Initial Distribution Date *less* the amount of Available Cash that may be required to be paid to the holders of Claims in Classes 19, 20, and 21 of the Plan if all Disputed Claims become Allowed in the full Disputed Amount; (iv) fourth, if the value of consideration paid under (i), (ii), and (iii) of this section 10.1.3 is less than such Pro Rata Share, Senior Unsecured Sinking Fund Debentures in an aggregate principal amount equal to the lesser of (a) the remaining amount of such Pro Rata Share after payment of the consideration under (i), (ii), and (iii) of this section 10.1.3 and (b) the aggregate principal amount of Senior Unsecured Sinking Fund Debentures remaining after making any Distribution required to be made to the Asbestos PD Trust on the Initial Distribution Date *less* the aggregate amount of Senior Unsecured Sinking Fund Debentures that may be required to be distributed to the Asbestos PD Trust if all Disputed Claims are disallowed; and (v) fifth, to the extent that the value of consideration paid under (i), (ii), (iii), and (iv) of this section 10.1.3 is less than such Pro Rata Share, Divestiture Notes in an aggregate principal amount equal to the lesser of (x) the remaining amount of such Pro Rata Share after payment of the consideration under (i), (ii), (iii) and (iv) of this section 10.1.3 and (y) the aggregate principal amount of Divestiture Notes remaining after making all Distributions required to be made to the holders of Claims in Classes 19, 20, and 21 of the Plan on the Initial Distribution Date *less* the aggregate amount of Divesture [sic] Notes that may be required to be paid to the holders of Claims in Classes 19, 20, and 21 of the Plan if all Disputed Claims become Allowed in the full Disputed Amount. On the Final Distribution Date, the Reorganized Debtors shall transfer and assign, or cause to be transferred and assigned, to the PI Trust all right, title, and interest in and to the Available Cash, Senior Unsecured Sinking Fund Debentures, Divestiture Notes, and shares of New Eagle–Picher Common Stock remaining after making all other Distributions required to be made under the Plan on the Final Distribution Date.

**10.2 Assumption of Certain Liabilities by the PI Trust.** In consideration for the property transferred to the PI Trust pursuant to section 10.1 hereof and in furtherance of the purposes of the PI Trust and the Plan, the PI Trust shall assume all liability and responsibility for all Asbestos Personal Injury Claims and Lead Personal Injury Claims, and the Reorganized Debtors shall have no further financial or other responsibility or liability therefor.

**10.3 Certain Property Held in Trust by the Reorganized Debtors.** If and to the extent that any property of the Reorganized Debtors specified in section 10.1 hereof, under applicable law or any binding contractual provision, cannot be effectively transferred and assigned to the PI Trust pursuant to section 10.1 hereof, or if for any reason after the Effective Date the Reorganized Debtors shall retain or receive any property that is owned by the Reorganized Debtors or the Debtors (as the case may be) and is to be transferred to the PI Trust pursuant to section 10.1 hereof, then the Reorganized Debtors shall hold such property (and any proceeds thereof) in trust for the benefit of the PI Trust and shall take such actions with respect to such property (and any proceeds thereof) as the Trustees shall direct in writing. The Reorganized Debtors shall provide to the Trustees reasonable access to the relevant books and records of the Debtors and the Reorganized Debtors during normal business hours for the purpose of assisting the Trustees in defending against the Asbestos Personal Injury Claims and Lead Personal Injury Claims and otherwise administering the PI Trust.

**10.4 Authority of the Debtors.** On the Confirmation Date, the Debtors shall be empowered and authorized to take or cause to be taken, prior to the Effective Date, all actions necessary to enable them to implement effectively the provisions of the Plan and the PI Trust Agreement.

Thus, Section 10.1.1 deals with the transfer of books and records, providing that all such books and records pertaining to Asbestos Personal Injury Claims or Lead Personal Injury Claims shall be transferred to the PI Trust on the Effective Date or as soon thereafter as is practicable. The Effective Date is defined at Section 1.1.58 of the Plan:

1.1.58 *Effective Date:* The first Business Day on which all of the conditions precedent to the effectiveness of the Plan specified in Section 7.9 have been satisfied or waived or, if a stay of the Confirmation Order is in effect on such date, the first Business Day after the expiration, dissolution, or lifting of such stay.

On this motion the parties are in agreement that the Effective Date was November 29, 1996. Section 10.1.2 deals with rights to insurance to be transferred to the PI Trust on the Effective Date.

In Section 10.1.3, the Plan deals with transfer of carefully specified Plan consideration, and Section 10.1.3 limits transfers to specified dates. The first date is the Initial Distribution Date. The Initial Distribution Date is defined at Section 1.1.80 of the Plan as follows:

1.1.80 *Initial Distribution Date:* A date on or after the Effective Date that is selected by Reorganized Eagle–Picher in its discretion but, in any event, is within thirty (30) days after the Effective Date, or such later date as the Bankruptcy Court may establish, upon request by Reorganized Eagle–Picher, for cause shown.

On the Initial Distribution Date, there is to be transferred to the PI Trust its "Pro Rata Share with respect to the PI Trust Share of the Distribution Value." Pro Rata Share is defined at Section 1.1.105, while Distribution Value is defined at Section 1.1.54. These definitions are as follows:

1.1.105 *Pro Rata Share:* amount obtained by dividing the Allowed Amount of an Allowed Claim, or, in the case of the Distribution to the PI Trust or the Asbestos PD Trust, the PI Trust Share or the Asbestos PD Trust Share, respectively, by the sum of (a) the PI Trust Share, the Asbestos PD Trust Share, and all Allowed Unsecured Claims (other than Allowed Convenience Claims), and Allowed Environmental Claims, and (b) the Disputed Claim Amount of All Disputed Unsecured Claims (other than Disputed Convenience Claims).

1.1.54 *Distribution Value.* The sum of the Equity Value *plus* Available Cash *plus* the aggregate face amount of the New Debt Securities.

The consideration to be transferred to the PI Trust on the Initial Distribution Date is carefully spelled out in Section 10.1.3 in five clauses. Following that recitation, Section 10.1.3 specifies what is to be distributed on the Final Distribution Date. The Final Distribution Date is defined at Section 1.1.68 as follows:

1.1.68 *Final Distribution Date:* A date on or after the Initial Distribution Date and after all Disputed Claims (other than Asbestos Personal Injury Claims, Lead Personal Injury Claims, and Asbestos Property Damage Claims) have become either Allowed Claims or Disallowed Claims that is selected by Reorganized Eagle–Picher in its discretion but, in any event, is no later than thirty (30) days thereafter, or such later date as the Bankruptcy Court may establish, upon request by Reorganized Eagle–Picher, for cause shown.

Section 10.2 provides for the assumption of liability by the PI Trust, and the relief of Reorganized Debtors from such liability. Section 10.4 then empowers debtors on the Confirmation Date, and prior to the Effective Date, to take the actions necessary to implementation of the Plan and the PI Trust Agreement.

The section of Article 10 critical to the controversy at hand is Section 10.3 which the PI Trust here asserts requires that all property destined for the PI Trust, and not distributed to it on the Initial Distribution Date, is to be regarded as the res of an express trust held by the Reorganized Debtors for the benefit of the PI Trust. This res, according to the PI Trust, should have, from the Effective Date, been treated as a trust res with the Reorganized Debtors as the trustee. That res, says the PI Trust, should have been earning interest, and the PI Trust has been deprived of this benefit.

In dealing with the question before us, we must look to state law to determine whether Article 10.3 of the Plan created an express trust. *Capitol Indem. Corp. v. Interstate Agency (In re Interstate Agency)*, 760 F.2d 121, 124 (6th Cir. 1985); *New Hampshire Ins. Co. v. Jones (In re Jones)*, 158 B.R. 731, 733 (Bankr. E.D.Tenn.1993). We apply the law of the State of Ohio, for it was in the State of Ohio that the Plan arose. The requirements of an express trust in Ohio are:

(1) an explicit declaration of trust, accompanied by an intention to create it, or circumstances which show beyond reasonable doubt that a trust was intended to be created;

(2) an actual conveyance or transfer, of a lawful, definite property, estate, or interest, for a definite term, made by a person capable of making a transfer of it; and

(3) a vesting of the legal title presently in a person capable of holding it, to hold as trustee for the benefit of a cestui que trust or purpose to which the trust fund is to be applied, or a retention of title by the owner under circumstances which clearly and unequivocally disclose an intention to hold for the use of another. (Footnotes omitted.)

91 Ohio Jur.3d *Trusts,* § 89 (1989). *See also Ulmer v. Fulton,* 129 Ohio St. 323, 339, 195 N.E. 557 (1935).

The first requirement for an express trust is that there be an intention to create one "or circumstances which show beyond reasonable doubt that a trust was intended to be created." That the term "trust" is used is not enough to establish that an express trust was intended. *American Family Mut. Ins. Co. v. Pehkonen (In re Pehkonen)*, 15 B.R. 577, 581 (Bankr.N.D.Iowa 1981); *In re Estate of Koval,* 8 Ohio Misc. 206, 208, 221 N.E.2d 490, 492 (1966);. Upon a consideration of the Plan provisions, this court concludes that it has not been shown beyond a reasonable doubt that it was the intention of the drafters of the Plan that an express

trust be created by the language in § 10.3 of the Plan. Our conclusion is based upon the following reasons.

■ 1. The rule that the practical construction of an instrument is strong evidence of its intended meaning applies to trusts as well as other relationships. 91 O.Jur.3d *Conduct of Parties* § 85 (1989); *see also Hill v. Irons,* 160 Ohio St. 21, 29–30, 113 N.E.2d 243 (1953); *Squire v. Oxenreiter,* 130 Ohio St. 475, 479, 200 N.E. 503 (1936); *New Hampshire Ins. Co. v. Jones (In re Jones),* 158 B.R. 731, 734 (Bankr. E.D.Tenn.1993); *Bavely v. Powell (In re Baskett),* 1999 WL 1038266, at *6 (Bankr. S.D.Ohio 1999). The conduct of the parties since the Confirmation and Effective Dates are inconsistent with an intention to create an express trust. On the Effective Date, the PI Trust succeeded to ownership of the entire equity interest in the Reorganized Debtors, and this continued to be the situation until the PI Trust sold that equity interest. Thus, from November 29, 1996, the Effective Date, until February 23, 1998, the date the PI Trust sold its equity interest, the PI Trust had it within its power to formalize the trust which it here seeks, yet it did not do so.

The PI Trust then asserts that Respondent should have set up a trust structure and led it to believe that it had done so. The PI Trust has attached to its motion exhibits consisting of a letter from counsel for Reorganized Debtors to counsel for the PI Trust dated March 23, 1998, and another dated February 5, 1999. Movant says these informed it that property which was going to be transferred to it on the Final Distribution Date was being held in a trust. We note that both these letters are responsive to letters sent by the PI Trust, but the letters from the PI Trust are not included. There is nothing in the two letters from counsel to the PI Trust which suggest to this court that the PI Trust was demanding that there be a formal trust created with a res consisting of property not distributed on the Initial Distribution Date. Nor can the letters to the PI Trust

be read to say that that res was being held in an express trust. Not until the letter in the record dated March 5, 1999, which the PI Trust sent to the Reorganized Debtors, is there any indication that the PI Trust believed that property due it should be held in an express trust. Thus, for two and one-half years, in one year and a half of which affairs were totally in movant's control, movant did nothing to indicate that it believed that property should be held in an express trust. These facts are inconsistent with a position that an express trust was intended by the drafters of the Plan, much less that the evidence is clear and convincing of such an intent. *Ulmer v. Fulton,* 129 Ohio St. 323, 340, 195 N.E. 557 (1935).

2. Our conclusion is reenforced by the following considerations. The framers of the Plan well knew how to set up a technical trust when that was their purpose. They did so in Articles 10 and 11 when they created the PI Trust and the PD Trust. It does not make sense that the framers of the Plan would so casually have indicated an intent to create a trust of the kind urged by the PI Trust. The property which the PI Trust says was meant to be the res of the trust, that is, all property destined for the PI Trust not conveyed on the date of the Initial Distribution Date, was known at the time the Plan was drafted. Further, it was known that it would be of considerable amount, of the order of some $85 million on the Confirmation Date. Surely, if the framers of the Plan intended this to be the res of a trust, they would have set up a trust in the Plan as they did for the PI Trust and the Property Damage Trust.

■ 3. The structure of Section 10.3 suggests a different intention. The first clause of Section 10.3 expressed an intent that if property could not be distributed as provided in Section 10.1.3 by reason of "applicable law or any binding contractual provision", then it was to be held in trust. That is, if some unforeseen eventuality occurred by reason of which property to be

transferred as directed in Section 10.1.3 could not be transferred, then that property was to be held in trust. We then bring the rule of construction *ejusdem generis* into play in interpreting the second clause of Section 10.3. That rule is defined as follows in Black's Law Dictionary:

> A canon of construction that when a general word or phrase follows a list of specific persons or things, the general word or phrase will be interpreted to include only persons or things of the same type listed.

Black's Law Dictionary 535 (7th ed.1999). *Ejusdem generis* is a principle applied by the courts of Ohio in interpreting contracts. *George H. Dingledy Lumber Co. v. Erie R.R. Co.*, 102 Ohio St. 236, 245, 131 N.E. 723 (1921); *see also Kay v. Pennsylvania R.R. Co.* 156 Ohio St. 503, 103 N.E.2d 751 (1952) (following *Dingledy Lumber* at syllabus, ¶ 3); *Mchugh v. Bozorgi*, 1982 WL 3679, at *5 (Ohio App. 2 Dist.1982).

We hold that upon application of *ejusdem generis* the second clause of Section 10.3 should be read to apply only to property, disposition of which is prevented by unforeseen circumstances. Thus, if on the Final Distribution date some property cannot be transferred as directed in Section 10.3 for any unforeseen reason, then it shall be held in trust.

The motion of the PI Trust will be denied.